**In the Matter of the Necessity for the Hospitalization of JEFFREY E.**

**No. S–14419.**

Supreme Court of Alaska.

July 27, 2012.

Marjorie Allard, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for Appellant.

R. Scott Taylor, Senior Assistant Attorney General, Anchorage, and John J. Burns, Attorney General, Juneau, for State of Alaska.

Before: CARPENETI, Chief Justice, FABE, WINFREE, and STOWERS, Justices.

*OPINION*

WINFREE, Justice.

## I. INTRODUCTION

A respondent appeals his 30–day involuntary commitment order, arguing the evidence was insufficient to support the superior court's conclusion that he was gravely disabled. Because the superior court did not err in concluding that the respondent was gravely disabled under the required clear and convincing evidence standard, we affirm the 30–day commitment order.

## II. FACTS AND PROCEEDINGS

In June 2011 Jeffrey E.[1] was 20 years old, had recently lost his job due to behavioral difficulties, was in the process of divorcing, and was staying with family members. Jeffrey's family members became concerned about his behavior and brought him to a hospital. Jeffrey's family reported Jeffrey had not been eating, drinking, sleeping, or performing any self-care for several days— he had more or less remained seated in a catatonic state,[2] to the point of urinating on himself. Jeffrey's family also reported Jeffrey had made comments about others being able to read his mind, had responded aggressively to challenges, and had a family history of mental illness.

Jeffrey remained in the emergency room overnight for observation. He spent most of the night sitting awake in a chair and refusing medication, food, and drink. Because Jeffrey was uncommunicative, hospital staff could not determine if he was actively psychotic. Although unable to articulate how he would behave differently, Jeffrey wanted to go home and "denied thoughts or plans of self harm or harm to others." Hospital staff concluded Jeffrey "may be experiencing symptoms of psychosis but it is difficult to assess" and that "[h]e could benefit from further assessment and stabilization ... as it is possible he is experiencing psychosis."

The next day hospital staff filed a Petition for Initiation of Involuntary Commitment and an Application for Examination.[3] The superior court granted an ex parte order requiring Jeffrey's transport to Alaska Psychiatric Institute (API) for examination. A few days later API staff filed a petition for an involuntary 30–day commitment, and the court held a hearing on this petition.[4]

Dr. Kennedy Cosgrove, an API psychiatrist, testified at the hearing about his diagnosis of Jeffrey's mental illness—specifically psychotic disorder not otherwise classified. This diagnosis was based on behavior described by Jeffrey's family members and the hospital emergency room staff, as well as on Dr. Cosgrove's own observations at API. Dr. Cosgrove stated that Jeffrey's catatonia had "resolved rather quickly" after he took medication in the emergency room. Dr. Cosgrove stated Jeffrey had resumed adequate eating and drinking, and that he had stopped responding to internal stimuli—auditory hallucinations and delusional thoughts—by the day before the hearing.

1. We use a pseudonym to protect the respondent's privacy.

2. "Catatonia" is defined as a "phase of schizophrenia in which the patient is unresponsive ... [a] tendency to assume and remain in a fixed posture and inability to move or talk are characteristics of this phase." TABER'S CYCLOPEDIC MEDICAL DICTIONARY 305 (16th ed. 1989).

3. *See* AS 47.30.700 (regarding initiation of involuntary commitment proceedings based on probable cause to believe person is mentally ill and gravely disabled or likely to cause harm to self or others); AS 47.30.705 (establishing procedures

for emergency evaluation detention); AS 47.30.710(b) (authorizing hospitalization if a mental health professional "has reason to believe that the respondent is (1) mentally ill and that condition causes the respondent to be gravely disabled or to present a likelihood of serious harm to self or others, and (2) is in need of care or treatment," and requiring application for an ex parte order if no judicial order has been obtained under AS 47.30.700).

4. *See* AS 47.30.730–.735 (setting forth requirements for 30–day commitment petition and 30–day commitment hearing).

Dr. Cosgrove was concerned that Jeffrey lacked insight into his prior condition. Jeffrey had told Dr. Cosgrove "that he [had] no problem other than daydreaming and drinking alcohol and [did] not see anything wrong with him[self]." Dr. Cosgrove also was concerned that Jeffrey's lack of insight would result in Jeffrey discontinuing his medication, causing a return of his prior symptoms. Dr. Cosgrove testified to the serious consequences that would result if Jeffrey went off medication: "Catatonia returns often very quickly when someone stops the [medication] for it," and could return "in a matter of hours, certainly within a day." Dr. Cosgrove testified that Jeffrey's mental illness would worsen if not treated, and that the catatonia caused Jeffrey mental and physical distress.

Jeffrey also testified at the hearing. He described his condition upon arriving at the hospital as "positive," described his issues as "daydreaming" or "anxiety," and thought his stay at API was "kind of helpful." He said that if released, he would return to his brother's house, or a local homeless shelter if his brother would not let him return. He planned to contact his prior employer about re-employment and had enough savings to tide him over in the meantime. He stated he had been given the telephone number of a mental health clinician, whom he planned to contact on release. He also stated he planned to keep taking his medication if the clinician recommended it.

But Jeffrey also answered "no" when asked if he was "going to follow up for treatment for mental illness." He stated that he would be "furthering the process of getting medication for anxiety," but did not "really notice that much of a difference" once he began medication for catatonia. Jeffrey later stated he "possibly" would "consult with an-other physician regarding the need for ongoing medication."

The superior court found that: (1) Jeffrey was mentally ill; (2) Jeffrey was gravely disabled; and (3) no less restrictive facility than API would adequately protect Jeffrey. The court noted Jeffrey was a "functioning human being" at the time of the hearing, but was still vulnerable. The court found Jeffrey would not continue to take his medication on his own and that there were "catastrophic consequences of ceasing to take the medication."

Jeffrey appeals the superior court's finding that he was gravely disabled. He does not appeal the mental illness finding or the finding that API was the least restrictive alternative. Although Jeffrey was released from API shortly after being committed and the issue he raises is moot under the standard established in *Wetherhorn v. Alaska Psychiatric Institute*,[5] because this was Jeffrey's first involuntary commitment we consider his appeal under the collateral consequences exception to mootness recently adopted in *In re Hospitalization of Joan K.*[6]

## III. STANDARD OF REVIEW

■■■ "We review fact findings in involuntary commitment proceedings for clear error, reversing only if we are left with a 'definite and firm conviction that a mistake has been made.' "[7] We apply de novo review to related legal questions, "including whether the fact findings meet the statutory standards for involuntary commitment."[8]

## IV. DISCUSSION

■■ Before the superior court can involuntarily commit a person it must find, by clear and convincing evidence, that the person is "mentally ill and as a result is likely to cause harm to [self] or others or is gravely dis-

5. 156 P.3d 371, 380 (Alaska 2007) (holding an evidentiary-based challenge to an expired 30–day commitment order is moot and will not be reviewed absent an exception to the mootness doctrine).

6. 273 P.3d 594, 598 (Alaska 2012) (concluding "that there are sufficient general collateral consequences, without the need for a particularized showing, to apply the [collateral consequences exception to mootness] in an otherwise-moot appeal from a person's first involuntary commitment order").

7. *Id.* at 596 (quoting *In re Hospitalization of Tracy C.*, 249 P.3d 1085, 1089 (Alaska 2011)).

8. *Id.* (citing *E.P. v. Alaska Psychiatric Inst.*, 205 P.3d 1101, 1106 (Alaska 2009)).

abled."[9]  Clear and convincing evidence is "that amount of evidence which produces ... a firm belief or conviction about the existence of a fact to be proved."[10]  Gravely disabled is defined in AS 47.30.915(7)(B):

> "gravely disabled" means a condition in which a person as a result of mental illness
>
>  . . . .
>
> will, if not treated, suffer or continue to suffer severe and abnormal mental, emotional, or physical distress, and this distress is associated with significant impairment of judgment, reason, or behavior causing a substantial deterioration of the person's previous ability to function independently.

We have noted that this subsection of the statute "is concerned with a more passive condition, whereby the respondent is so unable to function that he or she cannot exist safely outside an institutional framework due to an inability to respond to the essential demands of daily life."[11]  To preserve the constitutionality of the statute, we have interpreted "distress" in AS 47.30.915(7)(B) as referring "to a level of incapacity that prevents the person in question from being able to live safely outside of a controlled environment."[12]  In sum, for Jeffrey to be committed to API there had to be evidence producing a "firm belief or conviction" that he would be unable to exist "safely outside of a controlled environment."

■ Jeffrey argues the superior court erred in finding him gravely disabled at the time of the commitment hearing. He concedes he was gravely disabled when he was admitted to the emergency room days before the commitment hearing.  But he contends that to be committed, he had to be gravely disabled at the time of the commitment hearing.[13]  He maintains the superior court contradicted itself by acknowledging he had "crossed the line" back to being a functioning human being but finding he was gravely disabled.

The State counters that the superior court made an "express finding" that Jeffrey was gravely disabled at the time of the commitment hearing and that this finding is entitled to "especially great deference" because it required the superior court to evaluate conflicting oral testimony and witness credibility.[14]  The State adds that recent behavior is relevant to whether a respondent is gravely disabled at the time of the hearing, and Jeffrey had very recently been catatonic.[15]

Jeffrey responds that the superior court's factual findings are reviewed for clear error but the ultimate legal conclusion of whether those facts meet the legal standard of gravely disabled is a question of law reviewed de novo.  He contends that a lack of insight into his mental condition and a "realistic probability" that he would stop taking his medication provide an insufficient basis to find him gravely disabled.

Regarding the standard of review, Jeffrey is correct; factual findings are reviewed for clear error, but the ultimate legal conclusion of whether those facts meet the "gravely disabled" criteria is reviewed de novo.[16]  Jeffrey and the State are each partially correct in reading *Tracy C.*—a respondent must be gravely disabled at the time of the commitment hearing, but recent behavior is probative of whether the respondent is gravely

---

**9.**  AS 47.30.735(c).

**10.**  *In re Johnstone,* 2 P.3d 1226, 1234–35 (Alaska 2000) (quoting *Buster v. Gale,* 866 P.2d 837, 844 (Alaska 1994)).

**11.**  *Wetherhorn v. Alaska Psychiatric Inst.,* 156 P.3d 371, 376 (Alaska 2007) (citing *In re LaBelle,* 107 Wash.2d 196, 728 P.2d 138, 144 (1986)).

**12.**  *Id.* at 378.

**13.**  *See In re Hospitalization of Tracy C.,* 249 P.3d 1085, 1093 (Alaska 2011) ("We therefore conclude that although the superior court may only grant an involuntary commitment petition if it finds by clear and convincing evidence that the patient is mentally ill and likely to harm herself or others or is gravely disabled at the time of the commitment hearing, when making that determination the court may consider the patient's recent behavior and condition as well as the patient's symptoms on the day of the hearing.").

**14.**  *See id.* at 1089.

**15.**  *See id.* at 1093.

**16.**  *In the Matter of the Necessity for the Hospitalization of Joan K.,* 273 P.3d 594, 596 (Alaska 2012).

disabled at the time of the hearing.[17] And we add that the statutory subsection is forward-looking with its concern that the respondent "will, if not treated, suffer or continue to suffer" distress as a result of the respondent's mental illness.[18]

Dr. Cosgrove testified that in his opinion, Jeffrey "would probably go off his medication and get back into the same situation rather quickly" without hospitalization. Dr. Cosgrove based his prediction on Jeffrey's lack of insight into both his condition and his need for treatment. He stated it was "not clear" to him whether Jeffrey would be able to obtain food and drink if released. Dr. Cosgrove also expressed "very significant concerns" about Jeffrey's ability to survive in the community if released.

The superior court explained its decision as follows:

> The standard is clear and convincing evidence of a high level of distress, impairing the person from being able to live safely outside of a controlled environment. On these facts, what you have is a gentleman who is—sounds like a very nice person. He is articulate and well spoken. He is two days or so past his hunger strike, and he doesn't know—he doesn't realize at an intellectual level that he was on a hunger strike. In other words, he has no appreciation of what his prior condition was, how much trouble he was in. What's changed is that he's taken some medication that has brought him out of frank catatonia where he was sitting on a couch and if—without an intervention, he would literally pee on himself, not eating, not drinking, and not able to lift himself by his own bootstraps out of that condition. He's now moved to a better condition, which is just across the line back to being a functioning human being. But he's so vulnerable right now, he's so fragile because he is just across the line. And it's obvious that he has no insight that it's the medication that has returned him to a state of lucidity able to seemingly talk in a way that superficially

sounds to have sufficient normalcy to put him out in the community. But what would clearly happen at this moment if he went out into the community with his level of insight, he's not going to take that medication.... And the catastrophic consequences of ceasing to take the medication are so high that he simply needs more time in the shelter of API to get himself together. He may cross that line into having acceptable judgment within a very short time. I agree ... that his release may well come well before 30 days are up. But it would be irresponsible for me to say he's at that point three days in.

Jeffrey is incorrect that the superior court's findings and conclusion contradict its own comments that Jeffrey had crossed the line back to being functional. Jeffrey may have been "functioning" at the time of the hearing, but this does not preclude him from also being "gravely disabled." As noted above, the statutory definition of gravely disabled is forward-looking—even if Jeffrey were not suffering from distress at the exact time of the hearing, he still could be gravely disabled at that time if he would suffer distress in the near future as a result of his mental illness. It is noteworthy that the trial court limited the commitment to 30 days or "until a moment when, in the best judgment of [Jeffrey's] treaters there, [Jeffrey had] recovered enough resiliency, enough judgment, that [he would] take the medication reliably that's going to protect [him] from returning to a condition that [he didn't] recognize [he] had fallen into."

■ Because there is no dispute that Jeffrey's catatonia made him gravely disabled, or that catatonia would reoccur shortly after the cessation of medication, the outcome of this appeal hinges on whether the superior court's finding that Jeffrey would not take his medication in the future is clearly erroneous. "We will grant especially great deference when the trial court's factual findings require weighing the credibility of witnesses and conflicting oral testimony."[19] Jeffrey's own testimony at the hearing supports Dr.

**17.** *In re Tracy C.,* 249 P.3d at 1091.

**18.** AS 47.30.915(7)(B).

**19.** *In re Tracy C.,* 249 P.3d at 1089 (quoting *Bigley v. Alaska Psychiatric Inst.,* 208 P.3d 168, 178 (Alaska 2009)).

Cosgrove's conclusion that Jeffrey lacked insight into his illness and Jeffrey's equivocal and contradictory testimony about whether he would continue taking his medication does not directly contradict Dr. Cosgrove's conclusion that Jeffrey would not take his medication in the future. The finding that Jeffrey's existing condition would cause him to not take his medication in the near future is not clearly erroneous. We therefore affirm the conclusion that Jeffrey was gravely disabled.

## V. CONCLUSION

We AFFIRM the superior court's 30–day commitment order.