NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| In the Matter of the Necessity for the Hospitalization of <br><br> NAOMI B. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

Supreme Court No. S-16888

Superior Court No. 3AN-17-02687 PR

<u>MEMORANDUM OPINION</u>
<u>AND JUDGMENT</u>*

No. 1768 – May 20, 2020

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Yvonne Lamoureux, Judge.

Appearances: Laurence Blakely, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for Naomi B. Katherine Demarest, Assistant Attorney General, Anchorage, and Kevin G. Clarkson, Attorney General, Juneau, for State of Alaska.

Before: Bolger, Chief Justice, Winfree, Stowers, Maassen, and Carney, Justices.

## I.    INTRODUCTION

Naomi B. was admitted to Alaska Psychiatric Institute (API) for a 30-day involuntary commitment in October 2017.[1] The magistrate judge concluded that Naomi

---

\*    Entered under Alaska Appellate Rule 214.

[1]    Pseudonyms are used to protect the party's privacy. This is the second time Naomi has appealed an involuntary commitment order to this court. *See In re*

(continued...)

met both statutory definitions of "gravely disabled," and the superior court adopted that recommendation without specifying which definition it relied on. Naomi appeals her grave disability determination, but we affirm the superior court's decision under subsection (B) of AS 47.30.915(9).[2]

## II. FACTS AND PROCEEDINGS

In early October 2017, Naomi's mother, Grace W., filed a petition for a court order to authorize the hospitalization of Naomi for evaluation. In the petition, Grace alleged that Naomi "appears to suffer fears, anxieties and delusions"; believes that "people . . . are constantly doing things to hurt her"; claims to hold a number of jobs; and has had "numerous episodes of screaming and prolonged shouting." According to the petition, Naomi had been admitted to API on more than eight occasions since 2002. Although Grace described Naomi as non-violent, Grace had been "hesitant to check on her" and was "afraid to enter the home" due to an incident in August 2017 when Naomi allegedly pushed Grace out of her apartment and attempted to slam the door on her. Grace also alleged that, due to her screaming episodes, Naomi was going to be evicted from the apartment Grace was providing her. Grace was attempting to locate new housing, but she was unsure whether Naomi could abide by the "No Disturbing Others" rules imposed at most buildings. Although Naomi had attempted to live independently in apartments, hotels, and shelters from 2013 to 2017, Grace perceived that Naomi was "frustrated and angry that her attempts to have others help the suffering people" that only

---

[1]    (...continued)
*Hospitalization of Naomi B.*, 435 P.3d 918, 929 (Alaska 2019), *reh'g denied* (Apr. 15, 2019).

[2]    AS 47.30.915(9) contains two definitions for the term "gravely disabled": subsection (A) concerns "complete neglect of basic needs," whereas subsection (B) focuses on "severe and abnormal mental, emotional, or physical distress."

she can hear have resulted in "being asked to leave the residences she ha[d] secured for herself." In addition to reportedly being found by police screaming incoherently in the middle of traffic in August 2017, Naomi was charged with criminal trespass for verbally harassing tenants on a commercial property the following month.

A screening investigation was conducted the same day Grace filed her petition.[3] Although the screening investigator attempted to contact Naomi twice, she did not answer. The investigator interviewed Grace, Naomi's landlord, and one of Naomi's neighbors, and recommended involuntary commitment under "grave disability criteria (B)." The magistrate judge was "somewhat familiar" with Naomi and found her to be "steadily decompensating" based on two petitions filed by Grace over the past month. Relying on the magistrate's recommendations, the screening investigation report, Grace's petition, and a review of court records, the superior court granted the order authorizing hospitalization for evaluation on October 9.[4] Naomi was taken in for evaluation the next day, and two mental health professionals, including API psychiatrist Dr. David Mack, petitioned for a 30-day commitment.[5] Dr. Mack diagnosed Naomi as having "schizoaffective disorder bipolar type current episode manic," noting that Naomi "shows gross disorganization of thought and delusions of grandiosity which prohibit

---

[3]     *See* AS 47.30.700(a) (requiring court to "immediately conduct a screening investigation" upon receipt of commitment petition); AS 47.30.915(19) (defining "screening investigation" to "includ[e] interviews with the persons making the allegations, any other significant witnesses . . . , and, if possible, the respondent," as well as an "evaluation of the reliability and credibility of persons providing information").

[4]     *See* AS 47.30.710(a) (requiring respondent delivered to evaluation facility under AS 47.30.700 to "be examined and evaluated as to mental and physical condition by a mental health professional and by a physician within 24 hours after arrival").

[5]     *See* AS 47.30.730(a) (requiring signatures of two mental health professionals on 30-day commitment petitions).

engagement in safe discharge planning." The court subsequently scheduled a commitment hearing for Naomi.**⁶**

Dr. Mack testified at the commitment hearing that he diagnosed Naomi with "a mood disorder with psychosis" and that she "presented to the hospital as manic." Naomi's disorder was expressing itself through delusions of grandeur, "potentially damaging" impulsiveness, pressured speech, and disorganized thinking. Dr. Mack noted that one theme to Naomi's delusions was her belief that she held a number of jobs, including "pediatrician and epidemiologist," and she would continue to describe these jobs "with escalation of volume, rage, intensity and accusation of not listening." Although it was possible for Naomi to "be redirected and be quiet," Dr. Mack testified that Naomi's delusions prevented his attempts to discuss "discharge planning and housing" with her. In regard to Naomi's lack of impulse control, Dr. Mack recounted the alleged assault on her mother, as well as incidents at the hospital where Naomi would "approach people very abruptly" and begin "talking in an extremely loud voice." Dr. Mack predicted that "if she's not in an environment where people understand [her behavior], this could end up with an altercation or repercussions." Dr. Mack also testified that Naomi would be unable to "focus long enough to independently organize a meal or obtain a meal without it being offered to her." Based on past evictions and instances of "accosting the staff, [and] making delusional comments," Dr. Mack did not think Naomi "could effectively establish and maintain her own housing." Dr. Mack reiterated that commitment was needed as "there is no housing available for her," Naomi's mother was no longer "providing the level of care or the follow-up that she did

---

**⁶** *See* AS 47.30.715 (directing court to hold 30-day commitment hearing within 72 hours of beginning of evaluation period if necessary); AS 47.30.735(b) (providing many of the rights of bench trial in 30-day commitment hearing).

at one point," and Naomi did not appear to have any other friends or family in the community.

On cross-examination, Dr. Mack testified that he had worked with Naomi on at least three previous occasions and that she was not underweight, malnourished, or dehydrated on her most recent admission to API. Dr. Mack also stated that his understanding of Naomi's housing situation came from her mother, and he admitted that he had not contacted any homeless shelters personally. Nonetheless, Dr. Mack believed that Naomi would be unable to abide by homeless shelters' basic rules of "getting along with people, cooperating, [and] maintaining adequate hygiene" based on his conversations with her and his "six years of experience" with patients coming from and returning to shelters.

Naomi presented no witnesses on her behalf, and she left the proceedings without affirmatively answering whether she wanted to testify. The magistrate judge interpreted Naomi's actions as "waiving any further right to be heard." The State closed by reiterating that "Dr. Mack's testimony is essentially uncontradicted," while Naomi's attorney suggested that there was no evidence Naomi was not providing for her basic needs, so a finding of "gravely disabled under subsection (A)" of AS 47.30.915(9) was unwarranted.

Based primarily on Dr. Mack's testimony, the magistrate judge found that Naomi's diagnosis of mental illness was "uncontroverted" and found Naomi "gravely disabled" under both subsections (A) and (B). The magistrate noted that Naomi had "lost support from family" and was no longer "functioning at a level that she used to," which was "causing her severe distress, loss of housing." In regard to meeting basic needs, the magistrate agreed that Naomi was "not starving to death. It's not freezing out. She's not running around naked." However, the magistrate reasoned that "in her condition, [Naomi] is not able to provide . . . safety or other basic needs," seeing as she

was "focused on things that have nothing to do with obtaining her basic medical needs, health needs, shelter needs, and has, in fact, lost some of those things because of her behavior." The superior court adopted the magistrate's proposed findings and committed Naomi to treatment at API for 30 days.[7] The superior court did not specifically indicate which subsection it relied on for the definition of "gravely disabled," although it stated that Naomi's loss of "multiple housing" and "support in the community," as well as Dr. Mack's belief that she was unable "to provide for her basic needs at this time," supported its conclusions.

Naomi appeals the superior court's commitment order.[8]

## III.   DISCUSSION

Naomi argues that the superior court's factual findings were insufficient to support the 30-day commitment order under either definition of "gravely disabled" in AS 47.30.915(9). In involuntary commitment proceedings, "[w]e review the superior court's factual findings . . . for clear error," only reversing "if we have a 'definite and firm conviction that a mistake has been made.' "[9] The superior court may commit an individual to a treatment facility after conducting a commitment hearing only "if it finds,

---

[7]     *See* AS 47.30.735(c) (allowing court to commit respondent to treatment facility for 30 days upon grave disability finding by clear and convincing evidence).

[8]     Although the underlying issue is technically moot, we recently held that "appeals from involuntary commitment orders are categorically subject to the public interest exception." *In re Hospitalization of Naomi B.*, 435 P.3d 918, 929 (Alaska 2019), *reh'g denied* (Apr. 15, 2019).

[9]     *Id.* at 923 (quoting *In re Hospitalization of Jacob S.*, 384 P.3d 758, 764 (Alaska 2016)). Our review for clear error in such situations " 'grant[s] especially great deference' to the trial court," and "we will not reweigh evidence if the record supports the court's finding." *In re Jacob S.*, 384 P.3d at 766, 769 (quoting *In re Hospitalization of Tracy C.*, 249 P.3d 1085, 1089 (Alaska 2011)).

by clear and convincing evidence, that the [individual] is mentally ill and as a result is . . . gravely disabled."[10]  The term "gravely disabled" is defined as:

> [A] condition in which a person as a result of mental illness
>
> > (A) is in danger of physical harm arising from such complete neglect of basic needs for food, clothing, shelter, or personal safety as to render serious accident, illness, or death highly probable if care by another is not taken; or
> >
> > (B) will, if not treated, suffer or continue to suffer severe and abnormal mental, emotional, or physical distress, and this distress is associated with significant impairment of judgment, reason, or behavior causing a substantial deterioration of the person's previous ability to function independently.[11]

As previously explained, the superior court did not specify which of the alternative definitions it relied on when it found Naomi to be "gravely disabled."[12]  Because we hold that there was ample evidence in the record to support that Naomi met the definition in subsection (B), we do not address her arguments under subsection (A).

We held in *Wetherhorn v. Alaska Psychiatric Institute* that an individual qualifies as "gravely disabled" if "the person is 'helpless to avoid the hazards of freedom either through [her] own efforts or with the aid of willing family members or friends.' "[13] This definition, therefore, applies to individuals "so unable to function that [they] cannot

---

[10]     AS 47.30.735(c).

[11]     AS 47.30.915(9).

[12]     As we did previously in *In re Naomi B.*, we again "take this opportunity to remind the superior court of the importance . . . of specifying the precise statutory grounds on which it makes findings of grave disability."  435 P.3d at 932.

[13]     156 P.3d 371, 376 (Alaska 2007) (quoting *O'Connor v. Donaldson*, 422 U.S. 563, 574 n.9 (1975)).

exist safely outside an institutional framework due to an inability to respond to the essential demands of daily life."[14]  In light of the "the social stigma" and lack of "job prospects" for those subjected to involuntary commitment, we construe AS 47.30.915(9)(B) in such a way "that the 'distress' that justifies commitment refers to a level of incapacity that prevents the person in question from being able to live safely outside of a controlled environment."[15]  In other words, it is not enough that commitment be in the individual's "best interests."[16]  We have also previously noted that the definition in subsection (B) "is forward-looking" in nature,[17] but it requires more than mere "speculative conclusions."[18]

We also upheld an earlier finding of grave disability against Naomi in *In re Hospitalization of Naomi B.*, which was based on nearly identical testimony from the same psychiatrist that testified in Naomi's commitment hearing here:

> Dr. Mack's uncontroverted testimony was that Naomi did not have housing, that Naomi's disorder was severe enough that she could not be expected to find housing on her own, and that she may not have been able to eat and shower regularly unless API provided her those amenities.  Naomi acknowledged that she was unable to engage in discharge planning because "[s]he talked over the doctors or others

---

[14]  *Id.*

[15]  *Id.* at 378.

[16]  *Id.*

[17]  *In re Hospitalization of Jeffrey E.*, 281 P.3d 84, 88 (Alaska 2012).

[18]  *In re Hospitalization of Stephen O.*, 314 P.3d 1185, 1195 (Alaska 2013).

trying to communicate with her" and "sometimes continued shouting even after returning to her own room."[19]

We thus affirmed the superior court's finding that "Naomi [was] gravely disabled under subsection (A) or (B) of AS 47.30.915(9) . . . because uncontroverted evidence supports either or both findings."[20]

Furthermore, general evidence of some ability to function independently is usually insufficient to overcome specific, forward-looking predictions based on expert testimony.[21] In *In re Hospitalization of Randy N.*, we upheld findings of grave disability against "some evidence favoring Randy's 'ability to function independently and live outside of a controlled environment.' "[22] An expert in psychiatric medicine "testified that Randy was reportedly in fine physical condition upon arrival at API, that he was able to take care of such needs as food and bathing without prompting at API, and that he would be able to arrange for food if released from API."[23] Although Randy "did not have a place to go," the expert opined "that he would be able to secure a hotel room."[24] But the expert "did not believe [Randy] would be able to follow the rules at a hotel or a homeless

---

[19]      *In re Hospitalization of Naomi B.*, 435 P.3d 918, 932 (Alaska 2019) (alteration in original), *reh'g denied* (Apr. 15, 2019).

[20]      *Id.*

[21]      *Cf. Acevedo v. Burley*, 944 P.2d 473, 475 (Alaska 1997) (noting that evidentiary hearing on motion to modify child support is unnecessary "where the moving party advances only 'generalized allegations of factual issues' that other record evidence convincingly refutes" (quoting *Epperson v. Epperson*, 835 P.2d 451, 453 n.4 (Alaska 1992))).

[22]      No. S-16535, 2019 WL 1503009, at *7-8 (Alaska Apr. 3, 2019) (quoting *In re Stephen O.*, 314 P.3d at 1195).

[23]      *Id.* at *2, *7.

[24]      *Id.* at *7.

shelter," having been banned from one hotel previously; had concerns about Randy's "ability to function independently" due to various "high-risk behaviors"; and testified that Randy was "decompensating," "not behaving appropriately," and "could possibl[y] be hurt" without treatment.[25]

Once again, Dr. Mack's testimony here is essentially unchallenged. Although Dr. Mack stated that Naomi was not malnourished or dehydrated when she was admitted to API and that he was not aware of the specific rules for any Anchorage homeless shelters, he also testified that Naomi had "no housing available for her" and had been "evicted from a number of apartments due to . . . erratic behaviors." Dr. Mack was likewise unable to engage Naomi in discussing a discharge plan due to her "delusions of grandiosity." While Naomi argues that her general physical health upon admission to API indicated that she "was in fact capable of independent function," Naomi never stated how she would obtain meals or where she would go once evicted from her current place, because she left the commitment hearing halfway through, thus "waiving any further right to be heard." Dr. Mack's general statements regarding physical well-being are insufficient to rebut his specific testimony about future "distress" from Naomi's inability to function independently.

Naomi also argues that a "finding of distress on [Naomi]'s alleged loss of housing" is clearly erroneous because the only evidence introduced was in her mother's petition for hospitalization. Dr. Mack acknowledged that he heard about Naomi's "housing situation" from her mother, but again, Naomi does not attempt to actually contradict any of that testimony. And as a treating psychiatrist and expert witness, Dr. Mack was entitled to rely on and testify regarding hearsay that informed his opinions,

---

[25]     *Id.* (alteration in original).

diagnoses, and recommended treatment.[26] Dr. Mack also expressed concern for Naomi's isolation and that her mother "is not providing the level of care or the follow-up that she did at one point." We conclude that sufficient evidence in this record supports a finding of "gravely disabled" under AS 47.30.915(9)(B).

## IV.  CONCLUSION

We AFFIRM the superior court's commitment order.

---

[26]     *See* Alaska R. Evid. 703, 803(4).