NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| In the Matter of the Necessity for the Hospitalization of | ) ) ) | Supreme Court No. S-17566 |
| MELODY B. | ) ) ) ) ) ) ) | Superior Court No. 3AN-19-01517 PR  MEMORANDUM OPINION AND JUDGMENT*  No. 1789 – September 16, 2020 |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, William F. Morse, Judge.

Appearances: Laurence Blakely and Renee McFarland, Assistant Public Defenders, and Samantha Cherot, Public Defender, Anchorage, for Melody B. Kimberly D. Rodgers, Assistant Attorney General, Anchorage, and Kevin G. Clarkson, Attorney General, Juneau, for State of Alaska.

Before: Bolger, Chief Justice, Winfree, Maassen, and Carney, Justices.

## I.    INTRODUCTION

A woman was admitted to a hospital after breaking all the windows in her family's home to release demons. After an evaluation at Alaska Psychiatric Institute (API), a magistrate judge recommended a 30-day commitment order based on oral findings that the woman suffered from mental illness and was gravely disabled. In his written recommendation, however, the magistrate judge also found that the woman was

---

\*    Entered under Alaska Appellate Rule 214.

likely to cause serious harm to herself and to others. The superior court adopted the recommended written findings and order. Upon reconsideration, the superior court ruled that the written findings regarding harm to self and others should be removed from the order.

The woman now appeals her 30-day involuntary commitment order, arguing that there was insufficient evidence to demonstrate that she was gravely disabled and that the commitment order must be redacted to conform with the superior court's order on reconsideration.

## II.    FACTS AND PROCEEDINGS

Melody B.[1] was admitted to a local hospital after breaking all the windows in her family's home to release demons, throwing an urn containing her parents' ashes, and smashing pictures of her parents. Melody subsequently was evaluated at API. Two mental health professionals from API petitioned for a 30-day commitment order, alleging that Melody was mentally ill, likely to cause serious harm to herself, likely to cause serious harm to others, and gravely disabled.

At the commitment hearing, a magistrate judge heard testimony from Melody's daughter, Melody's treating psychiatrist, and Melody. Melody's daughter testified that Melody had been off her medication for two years, during which time her condition had "progressively gotten worse." Melody's daughter explained that her mother had not been "taking care of herself" or "eating very much," and, as a result, "lost a lot of weight."

Melody's treating psychiatrist testified that Melody was experiencing "euphoria," which resulted in severe disturbances to her sleep cycle and recent weight loss of at least 20 pounds. Melody's psychiatrist also testified about Melody's

---

[1]    Pseudonyms are used to protect the privacy of Melody and her family.

"delusion" that she was pregnant via "immaculate conception," despite several negative pregnancy tests. Her psychiatrist further testified that Melody was experiencing "significant distress" due to her beliefs of persecution; specifically that she had written 80 or more letters to individuals in California seeking the return of property and finances she believed were stolen from her. The psychiatrist noted that Melody had reported trying to hang herself in response to previous beliefs of persecution.

Her psychiatrist opined "that [Melody] is at increased risk for harming herself based on a psychiatric deterioration," citing her self-reporting of "sporadic thoughts of suicide in the days and weeks prior to her admission" at API. When asked if Melody could meet her basic needs, her psychiatrist explained "that [Melody's] manic state has resulted in her avoidance of meeting basic daily requirements such as eating, sleeping; as we heard from her daughter, caring and cleaning her home; and now she has rendered the home . . . reportedly uninhabitable." Melody's psychiatrist opined that given Melody's refusal to participate in outpatient treatment programs and lack of appreciation for the benefits of medication, she required the structured environment at API to stabilize her condition. And her psychiatrist's opinion was that she would not be able to survive safely in the community. Melody's psychiatrist additionally testified, "It is my opinion that if she does not receive treatment, [Melody] will continue to deteriorate further."

Melody testified that she disagreed with the diagnosis that she was "delusional," but instead believed she suffered from PTSD. She stated that she was an "upside down cross," her deceased mother was a "devil," and her deceased father was a "demon." Melody further testified that she was being persecuted by lawyers, doctors, and courts, and hospitals and doctors "tried to murder" her. Melody additionally shared a song she had written, describing herself as "a goddess billionairess, against an army" who was pregnant with twins via "immaculate conception."

After oral argument, the magistrate judge reasoned that clear and convincing evidence established that Melody suffered from mental illness. The magistrate noted that although Melody was articulate in her testimony, the content of her speech clearly indicated she was suffering from mental illness. The magistrate also concluded that Melody was gravely disabled. But the magistrate found there was not clear and convincing evidence she was likely to cause serious harm to herself or others.

In his written recommendation, however, the magistrate judge checked the boxes indicating that Melody was likely to cause harm to herself and others. The magistrate also indicated that she was gravely disabled. The magistrate explained that Melody had physically deteriorated as a result of inadequate food and sleep, was not medication-compliant, and was demonstrating emotional and mental distress due to her mental illness. In the additional findings section, the magistrate wrote that Melody's "daughter reports significant emotional and mental [deterioration] over the past several years, especially when [Melody] is not compliant with prescribed psychotropic medications." The superior court adopted the recommended written findings and order.

Melody moved for reconsideration of the written findings that she was likely to cause harm to herself and to others, based on the magistrate's oral findings to the contrary. The State agreed with reconsideration, although for different reasons. The superior court determined the written findings on harm to self and others should be redacted from the commitment order.

Melody now appeals from the commitment order.

III. STANDARD OF REVIEW

"We review the superior court's factual findings in involuntary commitment . . . proceedings for clear error and reverse those findings only if we have a 'definite and

firm conviction that a mistake has been made.' "[2]  "However, whether those findings meet the statutory requirements for involuntary commitment . . . is a question of law to which we apply our independent judgment."[3]

## IV.    DISCUSSION

### A.    There Was Sufficient Evidence To Find That Melody Was Gravely Disabled.

Pursuant to AS 47.30.735(c), "[a]t the conclusion of the hearing the court may commit the respondent to a treatment facility for not more than 30 days if it finds, by clear and convincing evidence, that the respondent is mentally ill and as a result is . . . gravely disabled."  Although the superior court did not specify which definition of "gravely disabled" it was applying, the written and oral findings appear to address both definitions of "gravely disabled."[4]

---

[2]    *In re Hospitalization of Naomi B.*, 435 P.3d 918, 923 (Alaska 2019) (quoting *In re Hospitalization of Jacob S.*, 384 P.3d 758, 764 (Alaska 2016)).

[3]    *Id.* at 923-24.

[4]    AS 47.30.915(9) defines "gravely disabled" as follows:

[A] condition in which a person as a result of mental illness

(A) is in danger of physical harm arising from such complete neglect of basic needs for food, clothing, shelter, or personal safety as to render serious accident, illness, or death highly probable if care by another is not taken; or

(B) will, if not treated, suffer or continue to suffer severe and abnormal mental, emotional, or physical distress, and this distress is associated with significant impairment of judgment, reason, or behavior causing a substantial deterioration of the person's previous ability to function independently; . . . .

"An order granting a petition for involuntary commitment must be based on the patient's condition at the time of the commitment hearing rather than at the time of the patient's admission to the treatment facility . . . ."[5] In determining the patient's condition at the time of the commitment hearing, the trial court may consider the patient's recent conduct and conditions as well as the patient's symptoms at the time of the hearing.[6] We have previously recognized that the definition of "gravely disabled" in AS 47.30.915(9)(B) "is forward-looking with its concern that the [patient] 'will, if not treated, suffer or continue to suffer' distress as a result of . . . mental illness."[7]

Melody argues that there was insufficient evidence to demonstrate that she was "gravely disabled" under either definition. She asserts that any issues with her eating and sleeping habits were not so grave as to constitute a "complete neglect of basic needs" making "serious accident, illness, or death highly probable." She also argues that the treating psychiatrist's testimony regarding her feelings of persecution about having her belongings stolen, and the distress that caused, as well as his belief that her condition would worsen without treatment were insufficient to meet the standard of being unable to live "safely outside of a controlled environment."[8]

Melody's treating psychiatrist's testimony was based on his personal evaluation of Melody and her recent behavior. Melody told the treating psychiatrist about her demon and devil parents, which inspired her to break all the windows and pictures in the home; her belief she was a pregnant billionaire goddess; her belief about

---

[5]     *In re Hospitalization of Tracy C.*, 249 P.3d 1085, 1086 (Alaska 2011).

[6]     *Id.* at 1086-87.

[7]     *In re Hospitalization of Jeffrey E.*, 281 P.3d 84, 88 (Alaska 2012) (quoting former AS 47.30.915(7)(B)).

[8]     *Id.* at 87.

her stolen money in California; and a previous suicide attempt she had made in response to beliefs of persecution. Melody's psychiatrist testified that he did not believe Melody could meet her basic needs, she could not survive safely in the community, her psychiatric condition had deteriorated, and she required the structured environment at API to stabilize her condition.

Melody's own testimony indicated that she did not appreciate her mental health diagnosis on the day of the hearing (she asserted she had PTSD but was not delusional). Melody's testimony about her demon and devil parents, her description of herself as "an upside-down cross", and her song about her struggles as "a goddess billionairess, against an army" indicated that Melody's thought process was disjointed and paranoid at the time of the hearing, despite eating and exercising appropriate personal hygiene at API. Furthermore, Melody had demonstrated she was motivated to act on those beliefs by breaking all the windows in her home to release her devil and demon parents, as well as writing numerous letters to individuals in California regarding her stolen property. Melody's behaviors in response to her ongoing beliefs of persecution indicated that she had substantially deteriorated and would not be able to live independently. At the time of the hearing, Melody appeared highly motivated to act on her beliefs, even if those beliefs had no basis in reality. As we reasoned in *Tracy C.*, although "on the day of the hearing she was . . . sleeping and eating better, . . . it would defy common sense to ignore [her] treatment history, which supplied context for her symptoms on the day of the hearing."[9]

The evidence at the hearing suggested that Melody's home was uninhabitable, that she was not eating or sleeping well outside of API, and that she was refusing to take her medication based on her delusion that she was pregnant. The

---

[9] 249 P.3d at 1092-93.

evidence indicated her ability to function independently had substantially declined, her psychiatrist opined she could not survive safely in the community, and her psychiatrist predicted her condition would continue to decline without appropriate treatment. We conclude that the superior court did not clearly err when it found that Melody was gravely disabled.

**B.     The Commitment Order Should Be Redacted To Conform To The Superior Court's Order On Reconsideration.**

Melody argues that the commitment order must be redacted to remove the findings related to harm to herself and others to conform with the superior court's order on reconsideration. The State agrees that the written commitment order should be redacted to delete the findings that Melody was likely to seriously harm herself or others. We approve the parties' agreement on this issue based on the clear instruction of the superior court in the order on the motion for reconsideration.

**V.     CONCLUSION**

This matter is REMANDED to allow the superior court to redact the 30-day commitment order to conform with the superior court's order on Melody's motion for reconsideration. In all other respects, the 30-day commitment order is AFFIRMED.