NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

|  |  |
|---|---|
| In the Matter of the Necessity for the Hospitalization of<br><br>KAI H. | Supreme Court No. S-18862<br><br>Superior Court No. 3AN-23-01679 PR<br><br>MEMORANDUM OPINION<br>AND JUDGMENT[*]<br><br>No. 2085 – April 16, 2025 |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Adolf V. Zeman, Judge.

Appearances: Jenna C. Klein, Assistant Public Defender, and Terrence P. Haas, Public Defender, Anchorage, for Kai H. Jennifer Teitell, Assistant Attorney General, Anchorage, and Treg Taylor, Attorney General, Juneau, for State of Alaska.

Before: Carney, Borghesan, Henderson, and Pate, Justices. [Maassen, Chief Justice, not participating.]

## I.   INTRODUCTION

A man appeals a 30-day involuntary commitment order after the superior court found that he was gravely disabled and that there was no less restrictive alternative to commitment. Observing no error, we affirm.

---

[*]   Entered under Alaska Appellate Rule 214.

## II. FACTS AND PROCEEDINGS

Kai H.[1] is a 24-year-old man who lived in his parents' home. Due to his extremely apathetic and unhygienic manner of living, Kai's bedroom was so full of dirty dishes, rotten food, and trash that it attracted fruit flies and fungus gnats. He caused significant property damage to his parents' home and sent them threatening text messages that caused them to fear for their safety.

After Kai was detained at a local health clinic in July 2023, a mental health professional filed a petition and the superior court ordered him to be hospitalized for evaluation. Kai was transferred to the Alaska Psychiatric Institute (API) later that month. API subsequently petitioned for a 30-day commitment order, alleging that Kai was diagnosed with schizophrenia and exhibited "symptoms of paranoia, delusions, [and] hallucinations," that he was likely to cause harm to others,[2] and that he was gravely disabled.[3]

The commitment hearing was held over two days in August, and a superior court standing master heard testimony from three witnesses: Kai, Kai's mother, and a doctor who was Kai's treatment provider at API. The master found by clear and convincing evidence that Kai was likely to cause substantial harm to others in the form of property damage[4] and that he was gravely disabled.[5] And after finding that there was no less restrictive alternative,[6] the master recommended to the superior court that Kai should be involuntarily committed. Kai filed a written objection to the master's finding

---

[1]    We use a pseudonym to protect the respondent's privacy.

[2]    AS 47.30.915(15).

[3]    AS 47.30.915(11).

[4]    AS 47.30.915(15)(B).

[5]    AS 47.30.915(11).

[6]    AS 47.30.915(14).

that he was gravely disabled. The superior court adopted the master's findings and recommendations and issued a 30-day commitment order.[7]

Kai appeals.

## III. STANDARD OF REVIEW

We review factual findings in involuntary commitment cases for clear error.[8] A factual finding is clearly erroneous if we are left with "a definite and firm conviction that a mistake has been made."[9] "[W]hether [factual] findings meet the statutory requirements for involuntary commitment or medication is a question of law to which we apply our independent judgment."[10]

## IV. DISCUSSION

We affirm the superior court's commitment order. We hold that the superior court did not err by finding that Kai was gravely disabled under AS 47.30.915(11)(B).[11] We also hold that it was not plain error for the superior court to find that involuntary commitment was the least restrictive alternative.[12]

---

[7] The master made oral findings that Kai was gravely disabled "under both prongs," AS 47.30.915(11)(A) and (B). But the superior court's written findings cite only AS 47.30.915(11)(B).

[8] *In re Hospitalization of Naomi B.*, 435 P.3d 918, 923 (Alaska 2019).

[9] *Id.* (quoting *In re Hospitalization of Jacob S.*, 384 P.3d 758, 763-64 (Alaska 2016)).

[10] *Id.* at 923-24.

[11] "Gravely disabled" is defined as "a condition in which a person as a result of mental illness (A) is in danger of physical harm arising from such complete neglect of basic needs for food, clothing, shelter, or personal safety as to render serious accident, illness, or death highly probable if care by another is not taken; or (B) is so incapacitated that the person is incapable of surviving safely in freedom." AS 47.30.915(11).

[12] Because we conclude that the evidence supported a finding that Kai was gravely disabled, we need not determine whether he also was likely to cause harm.

**A.    The Superior Court Did Not Err By Finding Kai Was Gravely Disabled Under AS 47.30.915(11)(B).**

The superior court may issue a 30-day involuntary commitment order when it finds by clear and convincing evidence that an individual is "gravely disabled" as a result of mental illness.[13]  "Gravely disabled" is defined, in relevant part, as a condition in which a person is "so incapacitated that the person is incapable of surviving safely in freedom."[14]

When determining whether someone is gravely disabled, we are "concerned with a more passive condition, whereby the respondent is so unable to function that he or she cannot exist safely outside an institutional framework due to an inability to respond to the essential demands of daily life."[15]  "[I]t is not enough to show that care and treatment of an individual's mental illness would be preferred or beneficial or even in his best interests."[16]  A determination of grave disability should not be made lightly because the resulting involuntary commitment constitutes a "massive curtailment of liberty."[17]

During the hearing, Kai's mother testified about his severe lack of motivation, and the doctor described him as "amotivational" and "apathetic."  At the time he was committed to API, Kai's bedroom was covered in dirty dishes, rotten food, soda cans, and cigarette butts.  There was spit on the wall, and "a tremendous amount of fruit flies and fungus gnats."  His mother stated that this was "the ninth room that

---

[13]    AS 47.30.735(c); AS 47.30.915(17).

[14]    AS 47.30.915(11)(B). Because we affirm the finding under (11)(B), it is not necessary for us to address whether Kai was also gravely disabled under (11)(A).

[15]    *Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d 371, 376 (Alaska 2007), *overruled on other grounds by Naomi B*, 435 P.3d 918 (Alaska 2019).

[16]    *In re Hospitalization of Stephen O.*, 314 P.3d 1185, 1195 (Alaska 2013) (quoting *Wetherhorn*, 156 P.3d at 378).

[17]    *Wetherhorn*, 156 P.3d at 375-76.

[Kai has] destroyed" in their home. She said that Kai would "absolutely not" be welcomed back home without further treatment, adding, "He needs treatment . . . My family can't continue to live like this."

Furthermore, the doctor described Kai's apathy regarding the state of his bedroom as "somewhat delusional." The doctor recounted that when Kai was asked "how he could live in such a place like that," Kai responded, "[I]t's just like being out[side], just like being on the grass." The doctor said that Kai "seemed to not have the slightest clue" that the state of the bedroom was "[n]ot just messy, but unhealthy."

Kai argues that "the court decided to commit [him] because the cleanliness of his bedroom and his desire to 'smoke cigarettes and listen to music,' did not comport to the standards desired by his parents or the court itself." According to Kai, "the evidence presented regarding the effects of [his] mental illness on his ability to function was very limited." He points out that there was no finding that he suffered from delusions or hallucinations, "much less any that would impact his daily functioning."

Kai also seeks to distinguish his case from *In re Hospitalization of Rabi R.*, where we upheld a finding of grave disability based on the respondent's "extreme" condition on arrival at API.[18] In that case, the respondent was "covered in feces and vomit, and he was not . . . attending to his toileting needs, or showering" and had "open sores on his legs, putting him at risk of infection."[19] Kai argues that the evidence in his case does not rise to that level and does not demonstrate that he was "physically sick [or] malnourished . . . or that his lack of cleanliness presented any kind of health risk." Kai also points out that he "testified rationally and calmly at the [commitment] hearing" and argues that API "failed to demonstrate that [he] was 'so unable to function' at the time of the commitment hearing that he could not 'exist safely outside an institutional

---

[18]     468 P.3d 721, 733 (Alaska 2020).

[19]     *Id.* at 729, 733.

framework.' " But "recent behavior," like Kai's abject living conditions and his delusional disregard of the risks they posed to him, "is probative of whether the respondent is gravely disabled at the time of the hearing."[20]

Additionally, when determining whether a person is gravely disabled, the court may "consider consequences if the patient were discharged from hospitalization, including consequences of discontinuing medication."[21] While the doctor admitted that Kai had "improved significantly" since arriving at API, the fact that Kai was responding well to treatment at API is not necessarily indicative of his ability to function upon release. In other words, evidence regarding Kai's recent behavior *outside* of API is a stronger indicator of his ability to function "in freedom" than his medicated condition while at API.[22] In *In re Hospitalization of Jeffrey E.*, for example, we upheld the commitment of an individual who would rapidly decline without medication, even though at the time of the commitment hearing he was medicated and functional.[23] We affirmed the superior court's finding that Jeffrey would not take his medication if released, because Jeffrey's own "equivocal and contradictory testimony about whether he would continue taking his medication [did] not directly contradict [the doctor's] conclusion that Jeffrey would not take his medication in the future."[24]

The evidence in this case is analogous to that in *Jeffrey E.* The record demonstrates that Kai is "incapable of surviving safely in freedom,"[25] and that, despite promises to the contrary, he is highly unlikely to continue treatment if released from API. While unmedicated, Kai destroyed several rooms in his parents' home, and the

---

[20]     *See In re Hospitalization of Jeffery E.*, 281 P.3d 84, 87-88 (Alaska 2012).

[21]     *In re Hospitalization of G.L.*, 449 P.3d 694, 699 (Alaska 2019).

[22]     AS 47.30.915(11)(B).

[23]     281 P.3d at 87-89.

[24]     *Id.* at 89.

[25]     AS 47.30.915(11)(B).

master observed that photos of Kai's bedroom "indicate someone who is literally incapable of taking care of themselves." Both the doctor and Kai's mother testified that Kai had nowhere to go and was incapable of surviving on his own. Each time Kai was released from the hospital, his mother said, he "promises, 'I will take my medication, I will seek counseling' — it never lasted a week." She reported that Kai told her that "he does not have a condition" and "he is not crazy." When asked if Kai had an outpatient provider, his mother testified, "He refuses . . . he'll set up an appointment, but he won't attend." The court did not clearly err in finding that Kai's testimony that he would "probably" go to a behavioral health provider for his medication and treatment was outweighed by the ample evidence to the contrary. And the fact that Kai "may have been 'functioning' at the time of the hearing . . . does not preclude him from also being 'gravely disabled.' "[26]

We agree with the master's observation that if Kai were released from API, he would not be "able to obtain medication, food or shelter or surviv[e] on the streets of Anchorage." The superior court's finding of grave disability under (11)(B) is supported by the evidence. Observing no clear error in its factual findings[27] or error in its determination that the evidence met the statutory criteria,[28] we affirm.

### B. The Superior Court Did Not Plainly Err By Finding That Involuntary Commitment Was The Least Restrictive Option.

Kai objected to the master's findings and recommendations following the hearing, but only as "to the factual findings and legal conclusions that the State proved he is gravely disabled." Because he did not object to the master's finding that API was

---

[26] *In re Hospitalization of Jeffrey E.*, 281 P.3d 84, 88 (Alaska 2012).

[27] *In re Hospitalization of Naomi B.*, 435 P.3d 918, 923 (Alaska 2019).

[28] *Id.* at 923-24.

the least restrictive alternative capable of meeting Kai's treatment needs, we review his claim for plain error.[29] Plain error is an obvious error that is clearly prejudicial.[30]

Prior to issuing an involuntary commitment order, the superior court must first consider whether a viable less restrictive alternative to commitment exists.[31] To be viable, an alternative must be "feasible, available, and provide 'adequate treatment' for a respondent."[32]

The master was "persuaded by [the doctor's] testimony that [Kai] needs additional doses of long-acting psychotropic medication to truly stabilize him before it would be safe to release him." Both Kai's mother and doctor testified that Kai was unlikely to continue to take medication if released from API, and the master found their testimony more credible than Kai's assertion that he would "probably" receive medication from a behavioral health provider. Because the trial court made these credibility findings based on oral testimony, we give them "particular deference."[33]

Furthermore, the evidence demonstrates that Kai has no feasible and available alternative that would provide "adequate treatment."[34] Kai's parents will not allow him back in their home. After a prior hospital release, Kai briefly lived with an aunt, but she sent him back to his parents' house after only a month. And while Kai said that he could probably stay with a friend in Dillingham, he did not identify the

---

[29]    *See In re Hospitalization of Carter K.*, 557 P.3d 755, 761-62 (Alaska 2024) (holding timely objection under Alaska Probate Rule 2 is required and party's "failure to object precludes appellate review except for plain error").

[30]    *See In re Hospitalization of Gabriel C.*, 324 P.3d 835, 838 (Alaska 2014).

[31]    AS 47.30.735(d).

[32]    *In re Hospitalization of Declan P.*, 538 P.3d 318, 323 (Alaska 2023) (internal citations omitted).

[33]    *State v. Grubb*, 546 P.3d 586, 603 (Alaska 2024) (quoting *Burton v. Fountainhead Dev., Inc.*, 393 P.3d 387, 396 (Alaska 2017)).

[34]    *In re Declan P.*, 538 P.3d at 323.

friend or provide any specific information.[35] The master "[could] not fathom [Kai] being able to obtain medication, food or shelter or surviving on the streets of Anchorage were he to be released from API." Because Kai requires further medication and is unlikely to continue to take medication if released, commitment was "reasonably necessary for the administration of treatment."[36]

The superior court's finding that commitment was the least restrictive option is supported by the evidence, and we find no obvious or prejudicial mistake that would constitute plain error.[37]

## V. CONCLUSION

We AFFIRM the judgment of the superior court.

---

[35]    Moreover, he mentioned staying with a friend only after first saying he would go back to his parents' home and being reminded that this option was not available to him.

[36]    AS 47.30.915(14)(B).

[37]    *See In re Hospitalization of Gabriel C.*, 324 P.3d 835, 838 (Alaska 2014).