*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| In the Matter of the Necessity for the Hospitalization of | ) ) ) Supreme Court No. S-16928 |
| G.L. | ) ) Superior Court No. 3AN-17-00779 PR ) ) O P I N I O N ) ) No. 7412 – September 27, 2019 |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Erin B. Marston, Judge.

Appearances:  Megan R. Webb, Assistant Public Defender, and Beth Goldstein, Acting Public Defender, Anchorage, for G.L.  Kimberly D. Rodgers, Assistant Attorney General, Anchorage, and Kevin G. Clarkson, Attorney General, Juneau, for State of Alaska.

Before:  Bolger, Chief Justice, Winfree, Stowers, Maassen, and Carney, Justices.

WINFREE, Justice.

## I.    INTRODUCTION

A patient appeals a 180-day involuntary commitment order, arguing that the evidence presented at the commitment hearing was outdated and insufficient to support concluding that he continued posing a risk of harm to others.  Because the superior court correctly applied the involuntary commitment statute in this case, appropriately considering the patient's recent history of conduct and demonstrated unwillingness to comply with treatment, we affirm the commitment order.

## II.    FACTS AND PROCEEDINGS

### A.    Facts Leading To Involuntary Commitment

In 2015 then-21-year-old G.L. was arrested after allegedly firing a loaded shotgun at buildings and people in his village.[1] G.L. faced criminal charges related to the shooting, but the superior court ultimately ruled him mentally incompetent for criminal proceedings and in 2016 committed him to Alaska Psychiatric Institute (API) for competence restoration.

G.L. was diagnosed with schizophrenia. He refused to consistently take medications and "was becoming increasingly psychotic and paranoid and dangerous" while at API for competence restoration. His API psychiatrist later testified that G.L. experienced "somatic delusions," meaning he "believe[d] that things [were] happening to his body that [weren't] real." He believed, for example, that rats had infiltrated his body, that his "bones were melting," and that "ants [were] crawling on his eyes." The psychiatrist stated that G.L. also suffered from "persecutory delusions," meaning "he [felt] that people [were] saying things about him that [were] untrue," including that he had been diagnosed with schizophrenia. G.L. reportedly "pace[d] the hallways muttering under his breath" and "bec[a]me increasingly violent"; he kicked inanimate objects, charged at staff, and expressed suicidal and homicidal ideation. The psychiatrist testified that G.L. "had such profound psychiatric symptoms that they were interfering with his ability to participate in any competency restoration activities."

API petitioned the superior court for permission to involuntarily medicate G.L., but the court instead transferred G.L.'s custody to the Department of Corrections (DOC). While in DOC custody he apparently "head-butted a corrections officer."

---

[1]    Although we typically use pseudonyms to protect parties' privacy, we refer to the patient in this case by his initials in response to his request, "[b]ecause the use of pseudonyms can be confusing for an individual diagnosed with schizophrenia."

G.L.'s pending criminal charges were dismissed thereafter, and he was transferred back to API in March 2017.

## B. 30-Day Commitment And Court-Ordered Medication Petitions

API filed a 30-day commitment petition asserting that G.L. had a mental illness and was likely to cause harm to himself or others. API stated that he had a history of violence, including the alleged 2015 shooting, and discussed his threats of suicide and his "assaultive behaviors while at API and DOC in the past 8 months." API also stated that G.L. "does not believe he has a mental illness and . . . does not intend to take medications once he leaves the hospital." G.L. stipulated to the 30-day commitment in mid-April.

Three days before the end of his 30-day commitment period, API filed a 90-day commitment petition. The 90-day commitment hearing was continued until June, and in the interim API filed a petition for court-ordered administration of psychotropic medications. G.L. had been taking medications since being in DOC custody, but his API psychiatrist later testified that G.L. "had become increasingly vocal about his . . . wish not to take medications," and in early May he altogether refused to take medications. The medications were discontinued because of adverse effects associated with intermittent use. The psychiatrist later stated that G.L.'s somatic and persecutory delusions returned while he was off medications and that he had become "increasingly symptomatic," including trying to assault an API staff member and exhibiting angry outbursts.

A magistrate judge considered the medication petition in mid-May, hearing testimony from the API psychiatrist, two court-appointed visitors,[2] and G.L. The court-

---

[2] When a court considers a petition to authorize psychotropic medication, a "visitor" must be appointed to "assist the court." AS 47.30.839(d). The visitor's duties
(continued...)

appointed visitors offered conflicting testimony whether G.L. had capacity to provide informed consent. One court-appointed visitor, who had met with G.L. briefly one week before the hearing, testified that she believed he had capacity, because he "appear[ed] at that time to demonstrate rational thought process" and "expressed that he had a mental illness." But the other court-appointed visitor, who had met with G.L. the morning of the hearing, believed he lacked capacity, because he failed to "recognize that he has a mental illness" and could not participate in his treatment. This second court-appointed visitor also testified that G.L. had attacked an API staff member just a few days before the hearing and had been given crisis medications as a result.

The API psychiatrist testified about G.L.'s history and unwillingness to take medications. She stated that during a previous API admission, he had refused to voluntarily take medications. And although he had willingly taken medications when he arrived at API most recently, the psychiatrist stated that G.L. "did not feel he really needed them" and continually stated that "he did not plan to take them when he left the hospital." She testified that his stance remained the same on the morning of the hearing. She stated that without medication, "given [her] experience with him in the past where he was either engaging in self-destructive behavior or he was assaultive, . . . his behavior is going to continue to deteriorate and . . . we will see those sorts of behaviors again necessitating a further crisis period."

G.L. testified that he did not wish to take medications because he had not been medicated before the alleged 2015 shooting events and "didn't need them." He

---

**2**    (...continued)
include "gather[ing] and provid[ing] information to the court on . . . a patient's present condition [and] . . . conduct[ing] a search for any prior 'expressed wishes of the patient regarding medication.' " *Myers v. Alaska Psychiatric Inst.*, 138 P.3d 238, 243-44 (Alaska 2006) (quoting AS 47.30.839(d)).

discussed what he believed were the medications' adverse side effects, including paranoia. He stated that there were "no benefits" to taking the medications and that he did not believe he had schizophrenia.

At the end of the medication hearing the magistrate judge made oral findings, based on the psychiatrist's and G.L.'s testimony, that G.L. suffered from schizophrenia and lacked capacity to give informed consent. The magistrate recommended granting the medication petition, despite the risks associated with taking psychotropic medications, because G.L. is violent when unmedicated, and the benefits, including protecting others and alleviating some of G.L.'s suffering, outweighed the risks. The superior court affirmed the recommendation in a written order later that month.

## C.    90-Day Commitment Petition

After a June 2017 hearing a magistrate judge recommended denying API's 90-day commitment petition, finding that G.L. suffered from mental illness but that there was not clear and convincing evidence he posed a risk of harm to himself or others "while compliant with a treatment plan including appropriate medication." The magistrate judge found that G.L.'s sister's home was a viable less restrictive alternative placement, so long as he was closely monitored and he strictly complied with prescribed medications. API objected to the magistrate judge's recommendation, and the superior court held a de novo hearing on the 90-day commitment petition in July.

The superior court heard testimony from the API psychiatrist, G.L.'s API social worker, and G.L.'s sister. The psychiatrist recounted G.L.'s history of assaultive behaviors in and out of API, and she stated that since the court's May 2017 medication order, he had taken medications willingly and "he's more calm." She stated that he "still does not believe that he has a mental illness" nor that he needs medications. She stated that since taking the court-ordered medications, "he's done well because he's on

medications and he's in a really structured environment, and people are supervising him 24 hours a day." She explained that the medications are not curative; they simply manage symptoms of schizophrenia, and without the medications, he could become worse within one week. She stated that he "still has the same delusions, he just may be less preoccupied with them right now, so they don't interfere with his ability to function as much." And she noted that without medications, based on his past behaviors, "he could be very violent," and it could happen quickly. The psychiatrist did not believe there was a viable less restrictive placement for G.L. outside of supervised care where he could be forcibly medicated if needed.

The API social worker testified about G.L.'s continual indication that he would not take medications upon discharge. Although G.L.'s sister stated she would house him, the social worker believed, based on G.L.'s history, if released he would be at risk of harming himself or others. G.L.'s sister testified that she understood he "needs some help," and she acknowledged that she could not force him to take medications if he were unwilling.

The court issued oral findings at the end of the hearing, stating that G.L.'s history indicated he could be "clearly violent and likely to cause harm to others," based on his consistent expressions that he would discontinue medications if released. The court described him as a "time bomb if he doesn't take his medication" and noted the elevated "risks . . . of catastrophic unfortunate results" if G.L. were unmedicated. The court stated that his sister's home was not a viable option based "on the fact that whenever he doesn't take the medication within a week he's assaultive, he's aggressive, [and] he has a past history" of violence. The court's written order confirmed its oral findings, noting the psychiatrist's testimony that G.L. began decompensating within a week of not taking medications. The court granted the 90-day commitment, relying on

G.L.'s past actions, rapid decompensation rate, and intent to discontinue medication upon discharge.

### D.     180-Day Commitment Petition; Appeal

Prior to the 90-day commitment hearing, API filed a 180-day commitment petition, relying on the same reasoning it had used for its 90- and 30-day commitment petitions.  The court held a hearing in October, and testimony was given by the API psychiatrist, the API social worker, and G.L.'s API advanced nurse practitioner.

The psychiatrist testified that, as of July 2017, G.L. no longer was under her care.  She stated that her schizophrenia diagnosis had not changed and reiterated that G.L. could decompensate within about a week if unmedicated.  She testified about his consistent statements that he did not need medications and did not have a mental illness, and she discussed her concerns about him leaving API, where he is under constant supervision and "can be evaluated immediately" upon early signs of decompensation.

The API advanced nurse practitioner testified that G.L. had been under her supervision for the three weeks prior to the hearing.  She agreed with the psychiatrist's testimony that G.L. would decompensate rapidly without medications.  She stated that, when asked whether he would take medications upon leaving API, he had been equivocal, saying at different times both that he would and would not continue medications.  She explained that, during the week before the hearing, he had said he would not take medications upon discharge because they made him tired and he did not believe he had a mental illness.  But she stated that, on the morning of the hearing, he had said he would continue medications upon discharge, although he maintained that he was not mentally ill.

The advanced nurse practitioner also discussed an incident the prior month when G.L. had refused to take oral medications and required a forcible injection.  According to her testimony, he had refused medications because he did not believe they

were necessary or that he had a mental illness. Like the psychiatrist, the advanced nurse practitioner testified that no less restrictive treatment alternative would be viable because G.L. does not believe he has a mental illness and he needs constant supervision.

The API social worker testified that she had called 212 treatment facilities throughout Alaska in search of a viable alternative to API for G.L. Acknowledging that her medical knowledge of his case was limited and that medication was outside her purview, she stated that the only other facility willing to take him required infeasible on-demand outpatient providers for assistance. Although she still was working on his discharge plan, she stated that she "personally [didn't] choose to interact with [him] a whole lot" because she was scared of him.

The superior court issued oral findings at the end of the 180-day commitment hearing, granting the request. The court found that the one-week decompensation rate was "very concerning" and that there was no less restrictive alternative to commitment at API. The court stated: "The issue here is the concern . . . that when he stops taking medication, he becomes dangerous. It's not based on a theory or a possibility, it's based on the past history of several attempted murders and threatening people in [his village]." The court noted his "history of sometimes not [being] willing to take the medication, other times indicating he would," and that he recently required a forced injection after refusing to take oral medications. The court stated that "when we look at his condition now, yes, he is not violent, but that is because he is taking . . . medication" and "it would make no sense to simply look in a vacuum at the person on the day of the hearing, if they pose no risk on th[at] day because they're taking their medication." The court instead suggested looking to the patient's recent history, stating that it could "predict [his] dangerousness" at the time of the hearing based on his refusal to take medications, history of violence when he decompensates, and recent forced injection.

The court issued a written order in November. Acknowledging G.L.'s statement on the morning of the hearing that he would continue taking medications if discharged from API, the court dismissed this one-time statement as equivocal, at best, given his past opposite statements. The court concluded that he posed a substantial risk of harm to others and that no less restrictive and feasible alternative existed.

G.L. appeals the 180-day commitment order, arguing he did not pose a substantial risk of harm to others at the time of the commitment hearing.

## III.   STANDARD OF REVIEW

We review factual findings in involuntary commitment proceedings for clear error, reversing "only if we have a 'definite and firm conviction that a mistake has been made.' "[3] But whether those findings comply with statutory requirements is a legal question we review de novo.[4]

## IV.   THE SUPERIOR COURT DID NOT ERR BY DETERMINING THAT G.L. POSED A RISK OF HARM TO OTHERS.

### A.   Legal Framework

To involuntarily commit a patient for 180 days, the superior court must find by clear and convincing evidence that the person "is mentally ill and as a result is likely to cause harm to [self] or others or is gravely disabled."[5] We have looked to the statutory definition of "likely to cause serious harm" to give meaning to the involuntary

---

[3]   *In re Hospitalization of Connor J.*, 440 P.3d 159, 163 (Alaska 2019) (quoting *In re Hospitalization of Jacob S.*, 384 P.3d 758, 764 (Alaska 2016)).

[4]   *Id.* (quoting *Jacob S.*, 384 P.3d at 764).

[5]   AS 47.30.735(c) (providing required findings for 30-day commitment); AS 47.30.755(a) (providing same required findings for 90-day commitment); AS 47.30.770(b) (incorporating required findings for 90-day commitments into 180-day commitments).

commitment requirement.[6] A person is "likely to cause serious harm" if the person "poses a substantial risk of harm to others as manifested by recent behavior causing, attempting, or threatening harm, and is likely in the near future to cause physical injury, physical abuse, or substantial property damage to another person."[7]

We previously have discussed the relevant time frame the superior court can consider in determining whether a patient's recent conduct suffices for involuntary commitment. In *In re Hospitalization of Tracy C.* a patient was involuntarily committed for 30 days based on grave disability[8] but argued that the superior court erred by committing her because her condition had stabilized between her admission and her commitment hearing.[9] The probate master's findings, adopted by the superior court, "recognized that [the patient] had improved somewhat since her admission" but noted that her condition remained acute and "without further treatment, she would likely be hospitalized again."[10] Affirming the involuntary commitment order, we noted testimony that the patient "had repeatedly stopped taking her medication in the past."[11] We thus indicated that when granting an involuntary commitment petition the superior court may

---

[6]  *See In re Hospitalization of Joan K.*, 273 P.3d 594, 598 (Alaska 2012).

[7]  AS 47.30.915(12)(B).

[8]  The court concluded that, as a result of her mental illness, the patient would "if not treated, suffer or continue to suffer severe and abnormal mental, emotional, or physical distress, and this distress is associated with significant impairment of judgment, reason, or behavior causing a substantial deterioration of the person's previous ability to function independently." 249 P.3d 1085, 1091-92 (Alaska 2011); AS 47.30.915(9)(B) (defining gravely disabled).

[9]  *In re Tracy C.*, 249 P.3d at 1086.

[10]  *Id.* at 1094.

[11]  *Id.* at 1094 n.32.

consider a patient's treatment history and probability of further hospitalization if the patient does not take medication.

In *In re Hospitalization of Jeffrey E.* we similarly affirmed an involuntary commitment order that depended on superior court findings that the patient would not take medication in the future and that he lacked insight into his illness.[12]  Affirming the superior court's grave-disability finding, we stated that "even if [the patient] were not suffering from distress at the exact time of the hearing, he still could be gravely disabled at that time if he would suffer distress in the near future as a result of his mental illness."[13]  We thus indicated that the superior court may consider consequences if the patient were discharged from hospitalization, including consequences of discontinuing medication.

These cases emphasize that the superior court must find likelihood of harm to self or others based on the patient's condition at the time of the commitment hearing: "The superior court may not involuntarily commit a patient based only on the patient's symptoms at the time of admission to a treatment facility if by the time of the hearing the patient is no longer mentally ill . . . or likely to harm [self] or others."[14]  But in making the finding the superior court "may consider the patient's recent behavior and condition as well as the patient's symptoms on the day of the hearing" and the patient's treatment history.[15]

---

[12]     281 P.3d 84, 88-89 (Alaska 2012).

[13]     *Id.* at 88.

[14]     *In re Tracy C.*, 249 P.3d at 1092.

[15]     *Id.* at 1093, 1094 n.32.

-11-                                                                7412

**B.      Analysis**

G.L. argues that the superior court erred by finding that he was likely to cause harm to others at the time of the 180-day commitment hearing because it "relied on outdated — rather than recent — behavior, which is insufficient to justify an involuntary commitment." He clarifies in his reply brief that he is not disputing the court's underlying factual findings, instead contending that "given the stale nature of th[e] testimony, additional testimony of recent conduct was necessary." The State disagrees, arguing that the superior court appropriately determined he was likely to cause harm to others if released.

In finding that G.L. posed a risk of harm to others at the time of the commitment hearing, the superior court primarily relied on the testimony of the API psychiatrist, advanced nurse practitioner, and social worker. G.L. argues that the aggregated testimony was "legally insufficient to support a commitment order" and that the superior court needed more information for four main reasons: (1) the psychiatrist had not seen him for three months prior to the 180-day commitment hearing; (2) the social worker testified that she did not interact with him; (3) the advanced nurse practitioner, who interacted with him most recently, testified about his one-time statement that he would continue medication if discharged; and (4) in recent months he had refused medication only once and had displayed no signs of real aggression.

But the superior court did not err by relying on the testimony to find that G.L. presented a risk of harm at the time of the commitment hearing. And contrary to G.L.'s assertion, the evidence was sufficient for the superior court to make this finding. The court found that although he was not violent on the day of the hearing, that was "because he is taking . . . medication." The court concluded that G.L. presented a risk of harm to others based on his past actions, indication that he would discontinue medication upon discharge, and rapid decompensation rate. The record supports each

of these subsidiary findings and establishes that the superior court considered recent, as opposed to "outdated," evidence to determine G.L. posed a risk of harm to others as manifested by recent behavior.

First, nearly all the evidence favored finding that G.L. would discontinue medication if discharged; the only evidence suggesting otherwise was his expression on the morning of the hearing that he would continue medication, but he still did not understand the nature of his mental illness or accept his diagnosis. His actions through the 180-day commitment hearing supported finding that he would not continue medication if given the choice; he had refused medication just two weeks before the hearing, requiring a forcible injection, in part because he believed he was neither mentally ill nor needed medication.

Second, ample evidence suggested that G.L. could become dangerous if unmedicated. The court emphasized the non-theoretical nature of this possibility, noting "it's based on [his] past history of several attempted murders and threatening people in [his village]."[16] G.L.'s more recent history of dangerous behavior toward others included assaulting a DOC officer, trying to assault an API staff member, having angry outbursts

---

[16]     Although G.L.'s reply brief seems to challenge evidence of the alleged 2015 shooting as not properly before the superior court, testimony from earlier hearings supported this finding, and the superior court stated that it had reviewed the entire record prior to ordering the 180-day commitment. At the 90-day commitment hearing the API psychiatrist testified that she had discussed the shooting with G.L.: "He told me that he shot at people in [his village] because he was tired of people telling him to take medications. He was tired of people talking about him. . . . He said he used a shotgun . . . ." At the same hearing G.L.'s sister, who was reluctant to discuss the shooting, acknowledged that "he had a gun" and "one of the people that he went after had picked on him his whole life." Following that hearing the superior court found that G.L. "previously acted on . . . delusions in both [his village] and at API . . . . In [his village], he had shot a shotgun at people." *See* AS 47.30.770(d) (allowing superior court to rely on findings made at 30- and 90-day commitment hearings).

a few months before the 180-day commitment hearing, and requiring forced medication injections on two separate occasions, one just two weeks before the hearing. Taken together, the superior court did not clearly err when it determined that when he "stops taking medication, he becomes dangerous."

Finally, the record supports finding that G.L. could quickly become violent if his medications were discontinued. The API psychiatrist and advanced nurse practitioner both testified to the short time frame — about a week — in which G.L. could decompensate if unmedicated. The court did not clearly err by finding that it could "predict [his] dangerousness based on the time of the hearing" because G.L. had at various times refused to take his medications, had recently required a forced intramuscular injection, and had a history of violence upon decompensation.

In sum, the superior court properly applied the involuntary commitment statute when it granted the 180-day commitment petition based on G.L.'s condition at the time of the hearing, and the superior court properly considered his recent symptoms and behavior in making that determination. We therefore affirm the superior court's commitment order.

## V.  CONCLUSION

The superior court's decision is AFFIRMED.