NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| In the Matter of the Necessity for the Hospitalization of | ) ) ) | Supreme Court No. S-18355 |
| MARK V. | ) ) | Superior Court No. 3AN-16-00221 PR |
| | ) ) ) | MEMORANDUM OPINION AND JUDGMENT[*] |
| | ) ) | No. 1992 – October 11, 2023 |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Una S. Gandbhir, Judge.

Appearances: Megan R. Webb, Assistant Public Defender, and Samantha Cherot, Public Defender, Anchorage, for Appellant. Katherine Demarest, Assistant Attorney General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for Appellee.

Before: Maassen, Chief Justice, Carney, Henderson, and Pate, Justices. Borghesan, Justice, not participating.

I. **INTRODUCTION**

A man with severe mental illness has been committed to Alaska Psychiatric Institute (API) for more than seven years after attempting to kill his parents. In a jury trial on the State's petition to again extend his involuntary commitment, the State's evidence included photographs of weapons, with prominent Nazi insignia, that

---

[*]    Entered under Alaska Appellate Rule 214.

the man had ordered by mail during his commitment. The jury found that the man was mentally ill and likely to cause harm to himself or others, and the court ordered a further 180-day commitment. The man appeals, arguing that the superior court erred by admitting the evidence of his Nazi-themed paraphernalia. We affirm, holding that the evidence was relevant and that the superior court did not abuse its discretion by concluding that its probative value was not outweighed by the danger of unfair prejudice.

## II.   FACTS AND PROCEEDINGS

### A.   Background

Mark[1] has struggled with mental illness and been in and out of API for more than two decades.[2] His current commitment at API began in 2015, after he attempted to kill his parents with a knife.[3] In the years that followed, the superior court "repeatedly . . . granted 180-day extensions of Mark's API civil commitment."[4] The 180-day commitment petition at issue on this appeal was filed in October 2021. In a jury trial on such a petition, the jury is asked to answer two questions: whether the State has proven by clear and convincing evidence "that the respondent is mentally ill," and whether the State has proven by clear and convincing evidence that, as a result of the mental illness, the respondent "is likely to cause harm to self or others."[5]

---

[1]   We use a pseudonym to protect the respondent's privacy.

[2]   *See In re Hospitalization of Mark V.*, No. S-17881, 2022 WL 165057, at *1 n.2 (Alaska Jan. 19, 2022).

[3]   *Id.* at *1.

[4]   *Id.*

[5]   *See* AS 47.30.770(b) (allowing 180-day commitment "[i]f the court or jury finds by clear and convincing evidence that the grounds for 90-day commitment as set out in AS 47.30.755 are present"); AS 47.30.755(a) (allowing 90-day commitment "if the court or jury finds by clear and convincing evidence that the respondent is mentally ill and as a result is likely to cause harm to self or others, or is gravely disabled").

Before trial Mark filed a motion in limine asking the court to exclude evidence of items he had ordered by mail such as daggers and a sword adorned with Nazi imagery, including swastikas. He argued that the evidence was irrelevant because his mail-orders were not recent, the associations to Nazi Germany were unduly prejudicial, and the evidence was unnecessarily cumulative of the "substantial evidence" the State had used in previous trials to prove its case. Mark asked that the evidence be excluded, or, in the alternative, that the Nazi symbols be concealed.

The court denied Mark's motion, determining that the evidence was relevant because it "tends to make it more likely than not that [Mark] himself holds violent beliefs . . . and is therefore materially relevant to the question of whether he poses a harm to others." The court acknowledged the likely prejudicial effect of an association with Nazi Germany, but it found that the danger of unfair prejudice was outweighed by the evidence's probative value. Finally, the court explained that the evidence was not cumulative because no other evidence was related to Mark's ordering of weapons.

**B.   Trial**

At trial Mark again challenged the admission of the Nazi paraphernalia, focusing his argument on Alaska Evidence Rule 404(a), which, with some listed exceptions, prohibits the use of character evidence "for the purpose of proving that the person acted in conformity therewith on a particular occasion." The court found that Rule 404 was "intended to apply to conduct in the past" and therefore did not bar the admission of evidence intended to prove the likelihood of future harm.

**1.   Testimony about the 2015 attempted murder**

The State presented the recorded testimony of Mark's parents. Mark's mother testified that his mental illness became evident in his late teens, and he had his first psychotic break at about 20 years old, after which a doctor diagnosed him with

schizophrenia and prescribed him medication. Several years passed without incident. But Mark then stopped taking his medication and became "psychotic."

In the spring of 2015 Mark was living with his parents. His mother testified that after telling them he had to "go downstairs and pray," Mark came back upstairs with a "determined look on his face." He grabbed a knife and stabbed his parents repeatedly, telling them "to be calm and die." Both parents suffered extensive wounds but survived. Mark's mother testified that the attack was "with [her] all the time," causing Post-Traumatic Stress Disorder and a fear of her son. Mark's father's testimony was much the same.

The State also played a recording of Mark's 2015 arraignment for attempted murder. He called himself the messiah and told the court that his parents "deserved it" because they had "mutilated [his] genitals." He threatened the judge, saying, "You're going to let me go home today or someone's going to kill you for it," and he threatened everyone to "drop the charges . . . or you'll die."

**2.  Testimony about Mark's time at API**

After Mark's parents' testimony, the jury heard the testimony of Gerald Martone, a psychiatric nurse practitioner and a "primary care provider for patients at API." Martone testified that he had been involved in Mark's care for the past six years.

According to Martone, Mark continued to suffer from schizoaffective disorder and bipolar disorder, evidenced by hallucinations, delusions, mood dysregulation, and fluctuation between mania and depression. Martone testified that Mark currently had delusions about Satan and believed he was a descendant of Jesus, could control the sun and moon, and could perform telekinesis. Martone explained that Mark's disorders were incurable and would last his lifetime, and that his symptoms worsened if left untreated. Martone testified that Mark still had violent outbursts similar to that at his 2015 arraignment, though "less frequently and less intense[ly]" because of his medication; but when Mark did not take the medication, "[h]e deteriorate[d] rapidly

and dramatically," becoming "extremely psychotic and aggressive" within three to five days. According to Martone, Mark had made it clear that he would stop taking his medication if released from API because he "[did not] believe he [had] a mental illness" and thought the medication caused sexual dysfunction, which made him hostile toward staff members who were trying to get him to take it.

Martone testified that Mark was considered too dangerous to have a roommate and that he refused both individual and group therapy. He often played the guitar, but he had smashed several of them and was only allowed to play them in "a special room." Martone testified that Mark had a preoccupation with sexual themes and often propositioned staff members and other patients. At times he went into rages about his perceived sexual deprivation.

Martone testified that Mark threatened him frequently and that this behavior was worsening; in the months leading up to trial, Mark was "very intense," "very hostile," and "unpredictable." When Martone told Mark he could not go on an outing because of the COVID-19 pandemic, Mark "went on a rant and threaten[ed] to punch [Martone] in the face." Martone testified that Mark repeatedly threatened to kill staff members and as a result was barred from certain units at API. He testified that Mark had once barricaded a female staff member in a room and threatened to harm her; had threatened to punch another staff member in the face; and had recently told a nurse "he was going to cut [the nurse's] testicles off and sew them onto his chest." Martone testified that Mark would "occasionally yell[] that he would stab [his parents] again" if released from API, and that he said he was proud of what he had done to them.

The State relied on Martone's testimony to lay the foundation for photographic exhibits depicting, among other things, ceremonial daggers and a sword — including close-up shots of their decorative Nazi insignia — that Mark had ordered by mail as recently as two weeks before trial. The court admitted the exhibits over the defense's objection. Martone testified that Mark ordered such things almost once a

month on average, even though he knew the staff would not let him have access to them. Martone explained that Mark "ha[d] a preoccupation with violence" and an "infatuat[ion] with the Nazis," which he related to Mark's "enormous potential for violence." He described Mark's Nazi and white-power tattoos and a time when Mark "rant[ed]" about the Ku Klux Klan, although he clarified that Mark had never explicitly claimed to be a Nazi or a Ku Klux Klan member. Martone testified, however, that Mark expressed hatred toward Black people and would direct racial slurs at Black staff members. He concluded that Mark's "undirected rage, . . . hostility, [and] aggressive impulse[s]" would pose a risk to others if he was released from API.

A psychiatric nursing assistant testified after Martone and described a disturbing encounter he had with Mark a few months before trial. He testified that Mark was agitated, making graphic comments involving sex with minors, and expressing worry that API staff would take his testicles. Mark asked the nursing assistant for a rock so he could "bash [the nursing assistant's] head in with" it.

An API nurse testified last. He had worked with Mark for about five years and described his experiences with Mark's medication regimen. He testified that Mark believed he had the right to kill anyone who forced him to take medication; that Mark became agitated, violent, and assaultive when unmedicated; and that Mark was unlikely to take his medication if released into the community, which would make him a danger to society.

Following the witness testimony, the court took judicial notice of Mark's criminal record, his history at API, and the many times he had been found to be mentally ill and a risk to others.

### 3. The jury verdict, 180-day commitment, and appeal

The jury found, by the required clear and convincing evidence standard, that Mark was mentally ill and was likely to cause harm to himself or others. The court heard additional evidence on the question whether there was "a viable less restrictive

alternative to API,"[6] concluded there was not, and ordered that Mark be committed to API for an additional 180 days. Mark appeals, arguing that the superior court erred by allowing the State to introduce evidence of his Nazi-themed paraphernalia.

## III. STANDARD OF REVIEW

We review the superior court's decision to admit evidence for an abuse of discretion.[7]

## IV. DISCUSSION

### A. The Nazi-themed Evidence Was Relevant.

Alaska Evidence Rule 402 provides that "[a]ll relevant evidence is admissible" subject to identified exceptions. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[8] In involuntary commitment proceedings, the State must prove by clear and convincing evidence that the respondent is "mentally ill and as a result is likely to cause harm to self or others."[9] "A person is 'likely to cause serious harm' if the person 'poses a substantial risk of harm to others as manifested by recent behavior causing, attempting,

---

[6] Pursuant to AS 47.30.770(b), a 180-day order rests on a finding by "the court or jury . . . by clear and convincing evidence that the grounds for 90-day commitment as set out in AS 47.30.755 are present." And addressing those 90-day commitment orders, we have held that "the less restrictive alternative decision, including any necessary fact findings underpinning that decision, rests with the court and not the jury." *In re Hospitalization of Jacob S.*, 384 P.3d 758, 768 (Alaska 2016).

[7] *Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d 371, 375 (Alaska 2007), *overruled on other grounds by In re Hospitalization of Naomi B.*, 435 P.3d 918 (Alaska 2019).

[8] Alaska R. Evid. 401.

[9] AS 47.30.770(b); AS 47.30.755(a).

or threatening harm, and is likely in the near future to cause physical injury, physical abuse, or substantial property damage to another person.' "[10]

Mark argues that evidence of the Nazi-themed paraphernalia was not relevant because his assaultive conduct and threatening behavior had no demonstrated connection to Nazism. He argues that the State was required to "connect [his] racist[] ideologies with his schizoaffective disorder" and failed to do so. Without that connection, he contends, the evidence served only to paint him "as a frightening racist," and it therefore should have been excluded as irrelevant.

But we agree with the superior court's conclusion that the evidence was relevant to one of the critical questions posed to the jury: whether Mark was likely to pose a risk of harm to others. Most obviously, the evidence included edged weapons — daggers and a sword — the same type of weapon Mark had used in his attempt to kill his parents. In combination with the testimony that he was proud of that attempt and would consider another, evidence that Mark was actively seeking out weapons tended to make it more likely that he would harm others again if given the opportunity.

Also significant is Martone's description of Mark's interest in Nazism and white-power movements as a "preoccupation with violence," which Martone thought to be "clinically significant." The jury was entitled to rely on Martone's expert opinion that Mark's attraction to violent ideologies was a product of his mental illness, generating a belief in his own superiority and a correlative indifference toward the lives of others.[11] The jury could reasonably conclude, based on Martone's testimony, that

---

[10] *In re Hospitalization of G.L.*, 449 P.3d 694, 698 (Alaska 2019) (quoting AS 47.30.915(12)(B)). "We have looked to the statutory definition of 'likely to cause serious harm' to give meaning to the involuntary commitment requirement." *Id.*

[11] The State's burden is to prove that the patient's mental illness makes him likely to cause harm, not that the patient's mental illness caused each individual problematic act. AS 47.30.755(a); AS 47.30.770(b). Thus the State did not have to

this mindset made violence more likely if Mark were to be released into the community and unmedicated. The superior court therefore did not abuse its discretion when it found that the Nazi-themed paraphernalia was relevant to the matters directly at issue.

**B.      Any Danger Of Unfair Prejudice Due To The Evidence Was Outweighed By Its High Probative Value.**

Alaska Evidence Rule 403 provides that even relevant "evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Unfair prejudice is "not merely evidence that is harmful to the other party, but evidence that will result in a decision being reached by the trier of facts on an improper basis."[12] Mark argues that the evidence of his Nazi-themed paraphernalia was unfairly prejudicial because it "focused on Mark being a potentially dangerous person based on his racist beliefs and fascination with Nazi ideology."

The superior court found that the evidence was prejudicial but not unfairly so, and we agree. While evidence of Mark's association with Nazism and his decision to order daggers emblazoned with swastikas and other Nazi symbols was prejudicial to his case, the evidence was highly probative of an issue the jury was tasked with deciding: whether Mark was likely to cause harm to himself or others as a result of his mental illness. The superior court did not abuse its discretion when it weighed the evidence's probative value and danger of unfair prejudice and concluded that the evidence was admissible under Evidence Rule 403.

---

prove, as Mark argues, that he would not have ordered the Nazi-themed paraphernalia but for his mental illness.

[12]      *Hiller v. Kawasaki Motors Corp. U.S.A.*, 671 P.2d 369, 373 (Alaska 1983) (emphasis omitted).

## V. CONCLUSION

We AFFIRM the superior court's order for a 180-day commitment.