NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| In the Matter of the Necessity for the Hospitalization of<br><br>K.B. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Supreme Court No. S-18391<br><br>Superior Court No. 3AN-19-01097 PR<br><br>MEMORANDUM OPINION<br>AND JUDGMENT*<br><br>No. 2004 – January 10, 2024 |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Gregory Miller, Judge.

Appearances: Emily Jura, Assistant Public Defender, and Samantha Cherot, Public Defender, Anchorage, for K.B. Dave D. Biegel, Assistant Attorney General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for State of Alaska.

Before: Maassen, Chief Justice, and Carney, Borghesan, and Henderson, Justices. [Pate, Justice, not participating.]

## I. INTRODUCTION

The superior court committed a man with an extensive history of mental illness for a sixth consecutive 180-day period. The court found that the man was unable to effectively communicate about his needs, unable to access necessary resources, and had no housing or outpatient treatment options available. Although the man had made

---

\* Entered under Alaska Appellate Rule 214.

some improvement over the extended course of his treatment, the court determined that he remained gravely disabled.

The man challenges the 180-day commitment order, arguing that the court's conclusion that he was gravely disabled was based on improper factors and insufficient evidence. Seeing no error, we affirm.

## II. FACTS AND PROCEEDINGS

### A. K.B.'s Involuntary Commitments Since 2019[1]

K.B. has an "established diagnosis of schizoaffective disorder and persistent delusions." He has a history of committing violent assaults and property destruction as a result of his illness, and he has been civilly committed over 30 times. While committed at the Alaska Psychiatric Institute (API) in May 2019, he assaulted a staff member and was transferred to the Anchorage jail. Later in May, after criminal charges were dropped, he returned to API for evaluation of whether he met the criteria for civil commitment.[2] Following the evaluation and a hearing on API's subsequent petition, K.B. was involuntarily committed for 30 days in June.[3]

At the time of that June commitment, the court concluded that K.B. was likely to "cause serious harm to others," because he continued to assault API staff and his psychiatrist testified he was certain K.B. would act violently if released. Near the

---

[1] We use initials rather than a pseudonym at K.B.'s request.

[2] *See* AS 47.30.700 (outlining requirements for initial involuntary commitment for evaluation, including finding "probable cause to believe the respondent is mentally ill and that condition causes the respondent to be gravely disabled or to present a likelihood of serious harm to self or others"); AS 47.30.710 (permitting mental health professionals to petition for hospitalization after evaluation required by initial involuntary commitment); AS 47.30.715 (requiring hearing for 30-day commitment to occur within 72 hours of respondent's arrival at evaluation facility).

[3] *See* AS 47.30.735 (permitting court to order 30-day commitment, after a hearing, based on clear and convincing evidence "that the respondent is mentally ill and as a result is likely to cause harm to the respondent or others or is gravely disabled" and there is no "viable less restrictive alternative").

conclusion of the 30-day commitment period, API petitioned for an additional 90-day commitment.[4] The court held a jury trial in July and granted a 90-day commitment after the jury determined that K.B. was "mentally ill, and likely to cause harm."[5] The court at that time also approved a petition to involuntarily administer medication to K.B.

The court approved continuing 180-day involuntary commitments and involuntary medication petitions for the next five 180-day periods.[6] Beginning in April 2020, the superior court determined that K.B. was not only likely to cause serious harm to others, but also that he was "gravely disabled" due to his mental illness. At that time, the court found that he was "not logical, rational, or organized" and he was "not capable of finding food or shelter" outside of API. The court also noted that K.B. was banned from all local shelters and hotels due to his history of violence. At later hearings the court further found that K.B.'s "delusions are incapacitating to the point where his ability to care for himself is impeded." The court reiterated these findings and again determined that K.B. was gravely disabled in November 2020, April 2021, and September 2021.

The state petitioned for a sixth 180-day commitment, as well as for involuntary administration of medication, in March 2022. The petition alleged that K.B. was "[l]ikely to cause serious harm to others" because he "[h]as engaged in significant physical violence both in the community and at API" and that he was gravely disabled because he was "[u]nable to provide for basic needs, including

---

   **4**      *See* AS 47.30.740 (providing for 90-day commitment where, following 30-day commitment, respondent remains likely to cause harm to self or others or gravely disabled).

   **5**      *See* AS 47.30.745 (mandating hearing for 90-day commitment and entitling respondent to jury trial upon request); AS 47.30.755 (requiring court or jury to find by "clear and convincing evidence that the respondent is mentally ill and as a result is likely to cause harm to self or others, or is gravely disabled" for 90-day commitment).

   **6**      *See* AS 47.30.770 (adopting procedures and standards for 90-day commitment order for subsequent 180-day commitment orders).

housing/finances" and "would deteriorate much further if he stopped taking his medications."

## B.    The March 2022 Commitment Hearing

An involuntary commitment hearing was held before a superior court master in March 2022.  K.B.'s attending psychiatrist testified regarding K.B.'s history of illness and current status, including that K.B. had a "well established diagnosis of schizoaffective disorder and persistent delusions."  His delusions focused on his beliefs that he was in the military, part of "special ops," and working with the CIA.  According to the psychiatrist, K.B. also exhibited "disorganized thinking" and could only maintain a coherent conversation for a minute or two.

K.B.'s psychiatrist described his extensive history of assaults both within and outside API, and his history of property destruction.  Since November 2020 API staff had been able to prevent repeated assaults by very carefully avoiding behaviors and situations likely to trigger K.B. to act violently.  In particular, API staff were aware that K.B.'s triggers to violence included contradicting his delusions, entering his bedroom, and standing in his doorway.  K.B.'s psychiatrist testified that a person had to be "fairly knowledgeable" of the triggers in order to avoid a violent reaction.  The psychiatrist testified that he did not believe K.B. could make it in the community without someone to manage his triggers to keep him safe.  The psychiatrist explained that K.B. could "easily escalate" if someone laughed at or disagreed with his delusions, or simply said no to something that he wanted.

K.B.'s psychiatrist opined that K.B. would not be able to provide for his own needs.  He reasoned that K.B. had no access to financial resources, lacked the resources necessary to manage in the community, and focused on inappropriate goals like getting a deed to particular property.  K.B.'s guardian, his father, was not able to provide or secure housing for K.B.  Moreover, K.B. probably could not rent an apartment, and he had been banned from all shelters and many hotels in the Anchorage area.  He had "destroyed apartments pretty significantly" in the past and "set a place on

fire," so assisted living facilities would also be unwilling to take him. Nor was there an outpatient treatment program willing to accept K.B. at that time.

K.B.'s psychiatrist described how K.B.'s condition had improved during his recent period of commitment. Due to the reduction in K.B.'s assaults within API, facilitated by the staff's careful interactions, K.B. was able to move from a more restrictive unit to the regular civil commitment unit. The day before the hearing he had successfully participated in a supervised community visit to a drug store to get snacks and a soda. Recently, K.B. had been placed on API's complex discharge list, and was assigned a social worker who specialized in finding options for people with "almost impossible placement requirements."

Beginning in April 2021, K.B. was treated with two anti-psychotic medications, one given as both a long-acting injectable and as a daily oral medication, and the other given as a daily oral medication. The psychiatrist noted that the combination was unusual but led to some improvement. The psychiatrist testified that treatment with a long-acting medication would increase the likelihood that K.B. could be released. At the time of the hearing, though, the psychiatrist opined that K.B. would quickly deteriorate if released because he would not reliably take his oral medication and there was no outpatient facility willing to supervise him or administer the long-acting one. The psychiatrist testified that K.B. could eventually be released to non-secure housing, but only if he could get care from an outpatient facility with wraparound services and trained staff to prevent future confrontations. At the close of evidence, K.B.'s attorney stated that he was "not intending to make any arguments," beyond noting that K.B. did not wish to be at API.

The master then heard testimony from the court visitor and the psychiatrist about the medication petition. The court visitor testified that K.B. denied having a mental illness and that when he is on "the outside" he refuses to take medications because he is not "a druggie." The psychiatrist testified about the medications used to treat K.B. at that time and the side effects of those medications. The psychiatrist also

agreed with the court visitor's sense that K.B. did not believe he needed medication and testified that he occasionally refused the long-acting injectable medication while at API. Following the testimony by the State's witnesses, K.B.'s attorney indicated that he had no witnesses and no argument about the medication petition.

**C.    The Involuntary Commitment And Medication Orders**

The master determined that K.B. was gravely disabled due to his mental illness and granted the petition for the 180-day involuntary commitment. In oral findings the master declined to find that K.B. was likely to cause serious harm to others. But the master found that API did a lot to keep K.B. safe and keep him from assaulting others and that the general public would not be able to prevent triggering K.B. The master further found that because there was no outpatient program available for K.B., his treatment needs could not be met in a less restrictive setting. Finally, the master noted that while API was currently "appropriate," there was "some hope" that could change in the future due to K.B.'s improvements over the past year. After the master completed those oral findings, K.B.'s attorney stated that he had "[n]o objection" to the findings.

The master subsequently made written findings. The master first found that K.B. has schizoaffective disorder and persistent delusions, and that his thoughts are "disorganized, though he can maintain conversations for one to two minutes." The master also took judicial notice of the findings of fact from the previous commitment hearings.[7] The master acknowledged K.B. was improving, and attributed the improvement to both his treatment at API and the hospital's particular care in maintaining a highly structured and controlled environment. The master emphasized

---

[7]    AS 47.30.770(d) ("Findings of fact . . . made at a 30-day commitment hearing under AS 47.30.735, a 90-day commitment hearing under AS 47.30.750, or a previous 180-day commitment hearing under this section shall be admitted as evidence . . . .").

that staff members at API know K.B.'s triggers and how to avoid them, something the public would not be "able to avoid or manage to keep [K.B.] from decompensating." The master also observed that K.B. was at that time "banned from all shelters and [did] not have any housing." Finally, the master found that there was "not [at that time] an outpatient program that [was] willing to accept" K.B. The master also granted API's petition for non-crisis administration of medication, based upon the testimony of the court visitor and the treating psychiatrist. The superior court adopted the master's findings without objection from K.B.

K.B. now appeals, arguing that the superior court erred in concluding that he was gravely disabled. K.B. does not independently challenge the medication order except to ask that it be vacated if the commitment order is vacated.

## III. STANDARD OF REVIEW

We review factual findings in involuntary commitment proceedings for clear error, and reverse those findings only if we have a "definite and firm conviction that a mistake has been made."[8] "[T]he ultimate legal conclusion [regarding] whether those facts meet the 'gravely disabled' criteria is reviewed de novo."[9] "On appeal under a de novo standard of review, it is [our] task to ascertain whether the evidence relied on by the superior court satisfie[s] the requisite legal standards . . . [and] evidentiary burden[s]."[10]

---

[8] *In re Hospitalization of Jacob S.*, 384 P.3d 758, 763-64 (Alaska 2016) (quoting *Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d 371, 375 (Alaska 2007), *overruled on other grounds by In re Hospitalization of Naomi B.*, 435 P.3d 918 (Alaska 2019)).

[9] *In re Hospitalization of Jeffrey E.*, 281 P.3d 84, 87 (Alaska 2012) (citing *In re Hospitalization of Joan K.*, 273 P.3d 594, 596 (Alaska 2012)).

[10] *In re Hospitalization of Stephen O.*, 314 P.3d 1185, 1194 n.26 (Alaska 2013).

## IV. DISCUSSION

K.B. appeals the superior court's commitment order on two grounds. He argues first that the court misconceived the types of risk and harm that may support a determination of grave disability, and second that the court's findings are unsupported by the evidence. Observing no error or clear error, we affirm the court's commitment order.[11]

### A. The Court Considered Appropriate Factors When It Determined K.B. Was Gravely Disabled.

When ordering involuntary commitment for 180 days, a superior court must find by clear and convincing evidence that the respondent is either (1) "mentally ill and as a result is likely to cause harm to self or others" or (2) "gravely disabled."[12] As relevant to this matter, a person is "gravely disabled" when as a result of mental illness, the person "is in danger of physical harm arising from such complete neglect of basic needs for food, clothing, shelter, or personal safety as to render serious accident, illness, or death highly probable if care by another is not taken."[13] This standard examines a person's ability, or lack thereof, to provide for his or her own basic needs without assistance, and the risk of physical harm associated with any inability to do so.

---

[11] The State argues that because K.B. did not object to the master's findings before they were adopted by the superior court, we should conclude that K.B. waived his challenge to the master's findings and apply plain error review. Because we conclude that the commitment order survives the greater de novo standard, we need not address the issue of waiver.

[12] AS 47.30.755(a) (as made applicable to 180-day commitment by AS 47.30.770(b)).

[13] Former AS 47.30.915(9)(A) (2022). AS 47.30.915(9) was amended effective October 13, 2022. Ch. 41, §§ 28-31, SLA 2022. The relevant subsection, AS 47.30.915(9)(A) was recodified at AS 47.30.915(11)(A) but otherwise remained unchanged. AS 47.30.915(11)(A), *as amended by* ch. 41, §§ 28-31, SLA 2022.

In order to commit an individual under this standard, the risk of physical harm must be substantial.[14]

Courts may consider a variety of factors in determining whether a person is gravely disabled. Lack of housing outside of the institutional context is not enough, on its own, to find that a person is at risk due to neglect of the basic need for shelter.[15] But it is important context, especially if there is concern that a person will not remain stable in a homeless shelter.[16] Additionally, a lack of viable outpatient services can contribute to a finding of grave disability, especially if the person has deteriorated in an outpatient setting in the past.[17] But concern that a person will suffer harm as a result of stopping medications and subsequently decompensating must be based on more than

---

[14] *See, e.g.*, *In re Hospitalization of Meredith B.*, 462 P.3d 522, 525-26 (Alaska 2020) (applying to former AS 47.30.915(9)(A) (2022) the constitutional requirement to consider whether person is helpless to avoid the hazards of freedom).

[15] *See Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d 371, 378 (Alaska 2007), *overruled on other grounds by In re Hospitalization of Naomi B.*, 435 P.3d 918, 924 (Alaska 2019) (explaining that person cannot be committed for "unattractive," "socially eccentric," or "abnormal" behavior, nor even if the commitment is "beneficial or . . . in [the person's] best interests").

[16] *See In re Hospitalization of Randy N.*, No. S-16535, 2019 WL 1503009, at *7-8 (Alaska Apr. 3, 2019) (unpublished) (affirming finding of grave disability under both subsections based on likelihood that respondent would be unable to follow rules at hotel or shelter).

[17] *Cf. In re Hospitalization of G.L.*, 449 P.3d 694, 700 (Alaska 2019) (affirming finding that person was mentally ill and likely to harm others if released because person was likely to discontinue medication and return to being assaultive and dangerous); *In re Hospitalization of Marvin S.*, S-16899, 2019 WL 2880963, at *4 (Alaska July 3, 2019) (affirming finding person was mentally ill and gravely disabled under AS 47.30.915(9)(B) based in part on history of ceasing medication upon release from API).

mere speculation.[18]  Finally, a person's ability to effectively communicate needs to others is "plainly relevant" to that person's ability to function safely in the community.[19] We have previously affirmed a finding of grave disability based on a respondent's inability to communicate due to delusions and disorganized, aggressive behaviors, and lack of housing outside of API.[20]

We agree with K.B.'s argument here that the superior court's findings about the ease with which he could be triggered are more appropriately considered in an inquiry regarding K.B.'s risk of causing serious harm to others.  Although it could be argued that K.B.'s triggers increase the likelihood that he will completely neglect his personal safety, such an argument tends to undermine the statutory distinction between the types of behaviors and risks that give rise to grave disability and those that support a likelihood of "harm to self or others."[21]  Therefore, such a finding, on its own, would likely be insufficient to support a determination of grave disability.

K.B. further argues that the superior court should not have relied upon findings related to his lack of money and ability to find housing because these factors merely reflect that he had "become institutionalized and would struggle, at least unaided, to successfully reintegrate."  K.B. is correct that courts should be wary of continuing commitment based solely on a lack of familiarity with the outside world.

But here, where the court made numerous findings appropriately addressing K.B.'s inability to meet his own needs and the resulting risk of harm, the court did not err in concluding that K.B. was gravely disabled.  The court found that

---

[18]     *Cf. In re Hospitalization of Stephen O.*, 314 P.3d 1185, 1195-96 (Alaska 2013) (holding mere "probability" of deterioration insufficient to support finding of grave disability under AS 47.30.915(9)(B)).

[19]     *In re Hospitalization of Sharon W.*, No. S-17836, 2022 WL 390801, at *3 (Alaska Feb. 9, 2022).

[20]     *In re Naomi B.*, 435 P.3d at 922, 932.

[21]     AS 47.30.755(a).

K.B. still suffered from disorganized thinking and serious delusions. The record supports the conclusion that K.B.'s disorganized thinking and delusions were severe enough that he would not be able to effectively communicate his needs or to secure food or shelter. And the superior court found not just that K.B. had no housing, but that he would be utterly unable to secure shelter if released from the controlled environment of API. K.B.'s psychiatrist provided uncontroverted testimony that K.B. could not live with a family member, would not be able to access an apartment or other rental, and that no shelters, assisted living facilities, or hotels would take him. The psychiatrist also testified that K.B. had "no access to financial resources at this point," and that he was "not sure [K.B.] could manage financials" due to his disorganized thinking. Additionally, there was no outpatient program willing to accept him at the time. The court specifically found that "an outpatient program is necessary to meet [K.B.'s] psychiatric needs." And overall, the record supports the conclusion that if K.B.'s psychiatric needs were not met, he would be unable to avoid serious accident, injury, or death.

K.B. further argues that the court's reliance on the likelihood that he would miss doses or quit taking his oral medication does not support a finding of grave disability, as he contends this concern only relates to one of two medications he was taking. But K.B. does not appropriately frame the court's concerns in light of the evidence related to K.B.'s treatment needs. As a preliminary matter, the viability of outpatient care for a person is clearly an appropriate consideration in determining whether that person is gravely disabled.[22] According to K.B.'s psychiatrist, K.B.'s improvement over the prior year was attributable in part to his current combination of medications, which required both an injection and supervision to ensure he took the oral

---

[22] *See, e.g.*, *In re Marvin S.*, 2019 WL 2880963, at \*5 (affirming finding that access to outpatient care would be hampered by respondent's plan to camp in the woods and past history of deteriorating without outpatient care).

medication. And K.B. had a history of refusing both. Given the record, the court did not clearly err in determining that K.B. would deteriorate rapidly if released without an outpatient care facility willing to administer and monitor his compliance with his medications.

We recognize K.B.'s concern that the two bases for involuntary civil commitment — danger to self or others, and grave disability — should be clearly delineated. And we reiterate that courts should be wary of keeping someone committed solely because they have "become institutionalized." But here, the court considered and made findings regarding numerous appropriate factors that support its determination that K.B. was gravely disabled.

**B.    The Superior Court's Determination That K.B. Is Gravely Disabled Is Supported By Sufficient Evidence.**

K.B. also argues that the court's determination of grave disability is unsupported by the evidence. K.B. challenges the court's taking of judicial notice of previous findings and orders and argues that some of K.B.'s psychiatrist's recent testimony rebuts the notion that those prior findings continue to be relevant. We observe no error in the manner in which the court relied on the prior findings, and we conclude that sufficient evidence in the record supported the court's determination of grave disability.

A court's conclusion that a person is gravely disabled must be supported by clear and convincing evidence.[23] Clear and convincing evidence is "that amount of evidence which produces . . . a firm belief or conviction about the existence of a fact to be proved."[24] In an initial or subsequent 180-day commitment hearing, findings of fact

---

[23]    AS 47.30.755(a) (as made applicable to 180-day commitment by AS 47.30.770(b)).

[24]    *In re Hospitalization of Jeffrey E.*, 281 P.3d 84, 87 (Alaska 2012) (quoting *In re Johnstone*, 2 P.3d 1226, 1234-35 (Alaska 2000)).

from previous commitment hearings "shall be admitted as evidence."[25]  Only newly discovered evidence may be used to rebut previous findings.[26]

The court took judicial notice of findings supporting the previous 180-day commitment orders in this case.  Those prior findings describe K.B.'s mental state at particular points in the past, and they would not be sufficient on their own to support a continued commitment.[27]  But those findings provide important historical context regarding K.B.'s condition and the risks associated with that condition.[28]

Here, the court appropriately considered the findings underlying K.B.'s prior commitment orders along with evidence regarding K.B.'s current condition. Accordingly the court considered that K.B.'s severe delusions and illogical disordered thinking have previously rendered him unable to care for himself, that K.B. has previously decompensated quickly without medications, and that K.B. has been resistant to taking medications outside the controlled environment of API.  The evidence regarding K.B.'s current condition demonstrates that those historical concerns remain applicable.  As touched on above, K.B.'s psychiatrist testified that K.B. cannot maintain a logical conversation for more than one or two minutes, continues to exhibit disorganized thinking, has persistent delusions, has no access to housing or treatment outside of API's controlled environment, and would likely deteriorate quickly without access to an outpatient program and supervised medication distribution if released from API.  Indeed, the psychiatrist's testimony on these points was uncontroverted.  The court could properly consider K.B.'s trajectory based on the previous commitment

---

[25]    AS 47.30.770(d).

[26]    *Id.*

[27]    *See In re Hospitalization of G.L.*, 449 P.3d 694, 699 (Alaska 2019) (holding that involuntary commitment must be based on patient's condition at time of commitment hearing, but patient's treatment history "may" be considered by court to help determine the risk of future behavior or conditions).

[28]    *Id.*

findings when it assessed K.B.'s current risk of decompensation and associated risks of serious accident, illness, or death if released.

K.B. further argues that the psychiatrist's testimony that K.B. had been improving rebuts the previous findings and renders the court's current findings clearly erroneous. But we are not persuaded by this argument that seizes on one aspect of the psychiatrist's testimony and fails to consider the surrounding context. While the psychiatrist testified that K.B. had been improving, including that he had recently been able to make a supervised trip to the store, the majority of the psychiatrist's testimony focused on K.B.'s continued delusions and inability to communicate his needs clearly, his inability to access any form of shelter or outpatient treatment if released, and the likelihood of K.B.'s rapid decompensation outside the controlled setting of API. Although the psychiatrist's testimony regarding improvements in K.B.'s condition is encouraging, that testimony does not render the court's findings clearly erroneous.[29]

Because the superior court considered appropriate factors in determining that K.B. was gravely disabled, and because that determination was supported by sufficient evidence, we see no error in the commitment and medication orders.

## V.    CONCLUSION

We AFFIRM the 180-day commitment and involuntary medication orders.

---

[29]    We note also that the psychiatrist's testimony supports the court finding "[t]here is reason to believe that [K.B.'s] condition could be improved." AS 47.30.730(a)(3) (requiring involuntary commitment petition to allege there is reason to believe respondent's mental condition could be improved by the course of treatment sought, as made applicable to 180-day commitment proceedings by AS 47.30.770(a) and AS 47.30.740(a)).